**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Gilbert G. HAMEL, Defendant-Appellant.**

**No. 76–1478.**

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 11, 1976.

Decided March 10, 1977.

Raymond A. Ballard, Foster, Meadows & Ballard, Robert N. Dunn, Detroit, Mich., for defendant-appellant.

Frederick S. Van Tiem, Chief Asst. U.S. Atty., Detroit, Mich., Peter R. Taft, Jacques B. Gelin, Kathryn A. Oberly, Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before PHILLIPS, Chief Judge, and McCREE and ENGEL, Circuit Judges.

ENGEL, Circuit Judge.

Gilbert G. Hamel was convicted by a district court jury of wilfully discharging gasoline onto Lake St. Clair, a navigable waterway, in violation of Section 101 of the Federal Water Pollution Control Act, as amended in 1972, 33 U.S.C. § 1251 et seq.

In his direct appeal Hamel asserts that certain closing arguments of the prosecution were improper, that there was insufficient evidence of his identity and scienter to support his conviction and that the section of the Act under which he was indicted and convicted did not prohibit the discharge of gasoline. We affirm.

## SUFFICIENCY OF EVIDENCE

The proofs showed that on January 22, 1975, Raymond Zembrzycki and Ernest Gregg were ice fishing in the vicinity of the Blue Lagoon Marina on Lake St. Clair, Michigan. Concerned about a quantity of gasoline which they discovered on the ice around Blue Lagoon's pier, they asked Ronald Spradlin, a 16-year old boy who had accompanied them, to notify the appropriate authorities. Spradlin notified the Michigan Department of Natural Resources, which in turn notified the Coast Guard. Zembrzycki testified that in the meantime they observed a man in a tan jacket emerge from a blue-green car and proceed to a gasoline dispenser located at the end of the pier. The man "put his hand on the pump and turned something" on the dispenser, and then drove away. Three to five minutes later the fishermen noticed gasoline gushing from the pump. A few minutes after the discharge, the fishermen observed the same car return and the same man again touch something at the pump. Both fishermen at trial identified the man they observed as the defendant.

Two Coast Guard investigators arrived at the marina in response to the call. They saw a man, who later identified himself as Mr. Hamel, pumping gasoline into a Corvette automobile from a pump which was located in a different area than the pier. Hamel told the investigators he was the yard foreman for the Blue Lagoon Marina. Asked if he knew of any gasoline spill or if he knew of any other gas dispenser or pumps at the facility, Hamel responded that he did not. Coast Guard investigation later revealed that approximately 200 to 300 gallons of gasoline had been discharged upon the ice. An examination of the dispenser from which the fishermen had seen the gasoline discharged disclosed that it did not contain a pump. The proofs indicated that the pump was located in an underground

gas tank in front of the showroom of the marina and some distance from the dispenser. Chief Petty Officer McCauley of the United States Coast Guard testified that in order to dispense the gasoline both a lever on the dispenser and a pump situated at the tank source had to be activated.

Viewing the evidence most favorably to the government, *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Dye,* 508 F.2d 1226 (6th Cir. 1974), *cert. denied* 420 U.S. 974, 95 S.Ct. 1395, 43 L.Ed.2d 653 (1975), we are satisfied that the evidence, while circumstantial, was fully sufficient to justify submission of the issues of identity and scienter to the jury. Hamel was positively identified by two witnesses. His deceptive responses to the investigators and his observed journeys to and from the dispenser support the jury conclusion that Hamel intentionally activated the necessary levers to discharge the gasoline onto Lake St. Clair.

### IMPROPER CLOSING ARGUMENT

■ Defendant claims that the government in its final summation to the jury misstated the effect of 33 U.S.C. § 1321. Specifically the defendant urges that it was improper for the prosecutor to emphasize the criminal penalty in that section for the failure to notify authorities of an oil spill and neglect the section's civil remedies. However, the statement made, if incomplete, was nonetheless accurate. No objection was made by defense counsel at the time. To the extent the comment was improper, we consider it harmless.

### CRIMINAL LIABILITY FOR THE DISCHARGE OF GASOLINE UNDER SECTIONS 1311 and 1319

■ The defendant claims that any action taken against him by the government should have proceeded under either 33 U.S.C. § 1321 or § 13 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 407 (Refuse Act). Those statutes provide respectively for civil and criminal penalties for oil and gasoline spillage. However, defendant was indicted and tried under § 1319(c)(1), the criminal sanction provision of the Federal Water Pollution Control Act. The government's implicit assumption for the charge is that gasoline is a pollutant within the definitional section of the Act, § 1362(6). It is argued by defendant that gasoline cannot be construed as a pollutant under § 1362(6). Congress, it is claimed, could not have intended in enacting the 1972 amendments to provide criminal penalties for gasoline spills because criminal sanctions were already available under the Refuse Act and because the definition of "pollutant" under section 1362(6) fails to include oil and oil products as contrasted to the broad detailed inclusion of oil in the civil remedy provisions of § 1321. We disagree.

■ In the 1972 amendments to the Federal Water Pollution Control Act, Congress expressed its objective to eliminate the discharge of pollutants into the navigable waters by 1985.[1] The amendments seek to increase federal responsibility for the restoration and maintenance of the "chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Section 1311(a) states the broad primary declaration of the Act that the "discharge of any pollutant by any person shall be unlawful." Certain exceptions are provided, including the possession of a permit under § 1342. The negligent or wilful violation of § 1311(a), however, without justification subjects one to the criminal sanctions § 1319(c)(1). The statutory scheme of the Act relies heavily on the triggering mechanism of § 1311(a) which in turn is depend-

1. The Supreme Court discussed the reasons for the amendments in *Environmental Protection Agency v. State Water Resources Control* *Board,* 426 U.S. 200, 96 S.Ct. 2022, 48 L.Ed.2d 578 (1976).

ent of the definition of "pollutant".[2] That definition is provided in § 1362(6):

(6) The term "pollutant" means dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water. This term does · not mean (A) "sewage from vessels" within the meaning of section 1322 of this title; or (B) water, gas, or other material which is injected into a well to facilitate production of oil or gas, or water derived in association with oil or gas production and disposed of in a well, if the well used either to facilitate production or for disposal purposes is approved by authority of the State in which the well is located, and if such State determines that such injection or disposal will not result in the degradation of ground or surface water resources.

The government contended successfully at trial that gasoline could be subsumed under "biological materials". While admittedly petroleum products do contain organic com-

pounds,[3] we believe the more certain approach is an analysis of Congressional intent and legislative history. *Train v. Colorado Public Interest Research Group, Inc.,* 426 U.S. 1, 96 S.Ct. 1938, 48 L.Ed.2d 434 (1976). It is, of course, true that in hindsight the entire controversy might have been solved by the single addition of the term "petroleum products" to the definitional section. We do not, however, read the failure to do so as an intent to exclude these materials from the Act. On the contrary, we conceive the employment of the broad generic terms as an expression of Congressional intent to encompass at the minimum what was covered under the Refuse Act of 1899.

The Refuse Act of 1899, 33 U.S.C. § 407, is itself a codification of prior legislation. It prohibits the discharge of "any refuse matter of any kind or description whatever other than that flowing from streets and sewers and passing therefrom, in a liquid state, into any navigable water . . ."[4] In *United States v. Standard Oil Co.,* 384 U.S. 224, 86 S.Ct. 1427, 16 L.Ed.2d 492 (1966) the Supreme Court determined that commercially valuable aviation gasoline was within the proscription of the Act, rejecting

---

**2.** We also note the related definition in § 1362(19) for "pollution" as the "man-made or man-induced alteration of the chemical, physical, biological, and radiological integrity of the water."

The Committee has added a definition of pollution to further refine the concept of *water quality measured by the natural chemical, physical and biological integrity.* Maintenance of such integrity requires that any changes in the environment resulting in a physical, chemical or biological change in a pristine water body be of a temporary nature, such that by natural processes, within a few hours, days or weeks, the aquatic ecosystem will return to a state functionally identical to the original.

In those water bodies which are not pristine, it should be the national policy to take those steps which will result in change towards that pristine state in which the physical, chemical and biological integrity of the water body can be said to exist. Striving towards, and maintaining the pristine state is an objective which minimizes the burden to man in maintaining a healthy environment, and which will provide for a stable biosphere

that is essential to the well-being of human society.

S.Rep. 92–414, 1972 U.S.Code Cong. & Ad. News, pp. 3668, 3742.

**3.** The Webster Third New International Dictionary defines "petroleum" as "essentially a complex mixture of hydrocarbons of different types with small amounts of other substances (as oxygen compounds, sulfur compounds, nitrogen compounds, resinous and asphaltic components and metallic compounds) . . ." *The definition of "hydrocarbons" is "any of a large class of organic compounds containing only carbon and hydrogen . . ."* (emphasis added). We also note from the foregoing definitions the potential applicability of the phrase "chemical wastes" in § 1362(6).

**4.** Although originally thought only to bar the discharge of substances which would impair navigability, it is clear now that the Act bars the discharge of all foreign substances outside the scope of its exception. *United States v. Pennsylvania Chemical Corp.,* 411 U.S. 655, 671, 93 S.Ct. 1804, 36 L.Ed.2d 567 (1973).

defendant's contention that the statutory phrase "refuse matter" excluded valuable substances. To make the matter conclusive, the Supreme Court not only held that gasoline was encompassed in the term "refuse", but that it was undoubtedly a pollutant.

Oil is oil and whether useable or not by industrial standards it has the same deleterious effect on waterways. In either case, its presence in our rivers and harbors is both a menace to navigation and a pollutant.

*United States v. Standard Oil Co., supra,* at 226, 86 S.Ct. at 1428.

When the definition of pollutant in § 1362(6) is read in the light of the judicial construction of § 407, it becomes apparent that the Congress expressly intended by the more generic language to include discharged gasoline, for the framers expressly intended that the definition would at least be as broad as the coverage of the Refuse Act.

For the first time the Committee would add to the law a definition of the term pollutant. In order to trigger the control requirements over addition of materials to the navigable water, waters of the contiguous zone and the ocean, it is necessary to define such materials so that litigable issues are avoided over the question of whether the addition of a particular material is subject to control requirements. *The Committee has extracted from the Refuse Act the basic formula and added municipal discharges to it*, so that before any material can be added to the navigable waters authorization must first be granted by the Administrator, or State in the case of an approved State program, under Section 402. The Committee has made two specific exceptions from the term pollutant; sewage from

vessels, as that term is defined and controlled through the provisions of Section 312, and water, gas, or other materials associated with the secondary recovery of oil. (emphasis added)[5]

S.Rep. No. 92–414, 1972 U.S.Code Cong. & Ad.News 3742.

The Supreme Court in *Standard Oil* stated that "the meaning we must give the term 'refuse' must reflect the present codification's statutory antecedents." Similarly, in interpreting "pollutant", we find compelling the incorporation of the broad proscription of the Refuse Act into the Federal Water Pollution Control Act.[6] The value of a strong prohibition of all discharges was not underestimated by Congress:

The Committee believes that the no-discharge declaration in Section 13 of the 1899 Refuse Act is useful as an enforcement tool. Therefore, this section declares the discharge of pollutants unlawful. The Committee believes it is important to clarify this point: No one has the right to pollute.

S.Rep. No. 92–414, 1972 U.S.Code Cong. & Ad.News 3709.

Although in contrast § 1321 explicitly defines "oil" as within its coverage along with "hazardous substance",[7] we do not believe that that specificity of definition alone indicates that § 1321 was intended to be the sole Congressional expression on oil discharges. The language of § 1321 indicates that a primary concern is to arrange for the removal of oil spills in navigable water, § 1321(c), with the liability for the costs of removal assessed against the discharger. § 1321(f). In the case of an owner or operator of an onshore facility, the liability is limited to $8,000,000; however, on proof by the government that the discharge was the result of wilful negligence or wilful misconduct within the privity and knowl-

---

**5.** The addition of municipal discharges disavows the exception in the Refuse Act for liquid sewage. "Sewage" and "municipal waste" are now explicitly defined under the amendments as a pollutant. § 1362(6).

**6.** Permits for discharges under the Refuse Act are explicitly incorporated into the Federal

Water Pollution Control Act. 33 U.S.C. §§ 1342(a)(4), (5).

**7.** Section 1321(a)(1) defines "oil" as "oil of any kind or in any form, including, but not limited to, petroleum, fuel oil, sludge, oil refuse, and oil mixed with wastes other than dredged spoil".

edge of the owner, the owner or operator is liable for the full amount of the removal costs. The legislative history of the predecessor of § 1321 indicates that Congress was concerned with large oil spills as evidenced by the break-up of the tanker *Torrey Canyon* off the coast of England and the ruination of Santa Barbara's beaches by offshore drilling. H.R.Rep. No. 91–127, 1970 U.S. Code Cong. & Ad.News pp. 2691, 2692. Seen in this light, the primary concern is the preservation of the environment, not the imposition of criminal penalties. However, the existence of criminal sanctions outside of the section is explicitly acknowledged. To further cooperation and "to facilitate the mitigation of pollution damage", *Apex Oil Co. v. United States,* 530 F.2d 1291, 1292 (8th Cir. 1976), notification of an oil spill by a discharger or "exploitation of such notification shall not be used against any such person in any criminal case, except a prosecution for perjury or for giving a false statement." § 1321(b)(5). The same subsection also provides for a separate criminal penalty should a person fail to notify the appropriate authorities as soon as he has knowledge of any discharge of oil or a hazardous substance.

Concerned perhaps that the broad Congressional policy enunciated in § 1321(b)(1) that there should be no discharges of oil or hazardous substances into or upon the navigable waters might be thought to supersede other sections of the Act, the Conference report states that:

> Notwithstanding the broad definition of "discharge" in subsection (a)(2) the provisions of this section are not intended to apply to the discharge of oil from any onshore or offshore facility, which discharge is not in harmful quantities and is pursuant to, and not in violation of, a permit issued to such facility under section 402 [33 U.S.C. § 1342] of this Act.

S.Conf.Rep. 92–1236, 1972 U.S.Code Cong. & Ad.News pp. 3776, 3811.

However, if defendant's contentions are correct and gasoline is not a pollutant within the meaning of § 1362(6), the protective provisions of § 1342 would be inapplicable. Section 1342(a)(1) provides:

> Except as provided in sections 1328 and 1344 of this title the Administrator may, after opportunity for public hearing, issue a permit for the discharge of any *pollutant,* or combination of *pollutants,* notwithstanding section 1311(a) of this title . . . (emphasis added)

We note also the provisions of § 1321(*o*)(3):

> Nothing in this section shall be construed as affecting or modifying any other existing authority of any Federal department, agency, or instrumentality, relative *to* onshore or offshore facilities under this chapter or any other provision of law, or to affect any State or local law not in conflict with this section.

Although not necessarily intended to afford comity with co-existing criminal statutes, subsection (*o*)(3) expresses at least a Congressional intent that § 1321 should not be interpreted exclusively and that other remedies might be available.[8]

■ Appellant nevertheless urges us to eschew our construction of the Act out of deference to the general rule that penal statutes are strictly and narrowly construed. In so doing, he asks us to adopt the rationale of Mr. Justice Harlan's dissent in *Standard Oil, supra.* It is the rule of *Standard Oil,* however, and indeed of our own circuit's interpretation of water pollution legislation that it be given a generous rather than a niggardly construction. *Standard Oil, supra,* 384 U.S. at 226, 86 S.Ct. 1427; *United States v. Republic Steel Corp.,* 362 U.S. 482, 491, 80 S.Ct. 884, 4 L.Ed.2d 903; *United States v. Ashland Oil & Transporta-*

---

8. A position analogous to defendant's was argued by a defendant vessel in *La Merced* 84 F.2d 444 (9th Cir. 1936). The vessel was charged under the Refuse Act for the discharge of oil into navigable waters. Defendant contended that the broad prohibitions of the Refuse Act should not be construed to cover oil when the Oil Pollution Act of 1924 (a predecessor of § 1321) specifically covered the discharge of oil. The court, citing a savings clause comparable to § 1321(*o*)(3) in the Oil Pollution Control Act of 1924, rejected defendant's contention.

*tion Co.,* 504 F.2d 1317 (6th Cir. 1974). We may not ignore such a history.

Likewise we find no merit in defendant's argument that strict construction of the definition of "pollutant" under § 1362 should be favored because of the need of people to know what the law is to enable them to conform to it. Even Mr. Justice Harlan, in his dissent in *Standard Oil, supra,* 384 U.S. at 235, 86 S.Ct. 1427, found this argument unappealing with respect to a narrow construction of the Refuse Act. So do we and for the same reasons, which are strengthened here by the acknowledged applicability of the ban of the Refuse Act.

■ The fact that defendant might have been prosecuted under either § 1319 or § 407 is of no significance where Congress intended a more severe penalty in the event the discharge was deliberate and wilful.[9] When the same conduct is prohibited by two penal statutes, the government may proceed under either and the defendant may not complain if the government elects to proceed under the harsher one. *United States v. Gilliland,* 312 U.S. 86, 61 S.Ct. 518, 85 L.Ed. 598 (1941); *United States v. Librach,* 520 F.2d 550, 556 (8th Cir. 1975), *cert. denied,* —— U.S. ——, 97 S.Ct. 354, 50 L.Ed.2d 308 (1976); *United States v. Brown,* 482 F.2d 1359, 1360 (9th Cir. 1973).

Affirmed.

---

**9.** Section 1319(c)(1) requires proof of negligent or wilful behavior and subjects violators to a fine of not less than $2,500 nor more than $25,000 per day of violation or by imprisonment for not more than one year, or both. For a violation of the Refuse Act, section 411 provides for a fine not exceeding $2,500 nor less than $500 or by imprisonment for not less than thirty days nor more than $500 or by imprisonment for not less than thirty days nor more than one year or both. The Refuse Act has been interpreted as a strict liability statute. *United States v. White Fuel Corp.,* 498 F.2d 619 (1st Cir. 1974). Thus contrary to defendant's contentions, our construction of the Act does not make § 1319 superfluous or inconsistent with the Refuse Act. With the amendments of 1972, Congress provided a harsher penalty for the discharge of oil with the added burden on the government to prove scienter. We note the parallel provision in § 1321(f) for more extensive civil liability with proof of scienter.