**UNITED STATES of America, Appellee,**

v.

**FREZZO BROTHERS, INC., Guido Frezzo, and James L. Frezzo, Appellants.**

**Nos. 78–2670 to 78–2675.**

United States Court of Appeals,
Third Circuit.

Argued June 7, 1979.

Decided July 13, 1979.

Rehearing Denied Oct. 22, 1979.

William J. Gallagher (argued), Randy L. Sebastian, MacElree, Harvey, Gallagher & Kean, Ltd., West Chester, Pa., for appellants.

Peter F. Vaira, U. S. Atty., Walter S. Batty, Jr., Asst. U.S. Atty., Chief, App. Div., Bruce J. Chasan (argued), Asst. U.S. Atty., Philadelphia, Pa., for appellee.

Before ADAMS and ROSENN, Circuit Judges, and LACEY, District Judge.*

## OPINION OF THE COURT

ROSENN, Circuit Judge.

Since the enactment in 1948 of the Federal Water Pollution Control Act, 62 Stat. 1155 ("the Act"), the Government has, until recent years, generally enforced its provisions to control water pollution through the application of civil restraints.[1] In this case, however, the Government in the first instance has sought enforcement of the Act as amended in 1972, 33 U.S.C.A. §§ 1251–1376 (Supp.1973), against an alleged corporate offender and its officers by criminal sanctions. Whether the Government may pursue the criminal remedies under the Act before instituting a civil action or before giving written notice of the alleged violation is the principal issue presented in this appeal.

The appellants were convicted by a jury on six counts of willfully or negligently discharging pollutants into a navigable water of the United States without a permit, in violation of 33 U.S.C. §§ 1311(a), 1319(c). The corporate defendant, Frezzo Brothers, Inc., was fined $50,000, and the individual defendants, Guido and James Frezzo received jail sentences of thirty days each and fines aggregating $50,000. The Frezzos appeal from the trial court's final judgment of sentence. We affirm.

---

* Honorable Frederick B. Lacey, United States District Judge for the District of New Jersey, sitting by designation.

1. In a comprehensive analysis made in 1973 of the use of criminal sanctions under the Federal Water Pollution Act, Michael K. Glenn, former deputy assistant administrator for federal water enforcement, pointed out that: "[D]uring the past 25 years the federal government has relied almost exclusively on negotiation, public pressure, and voluntary compliance by dischargers as the principal means of achieving compliance with federal water pollution control laws." Glenn, *The Crime of "Pollution": The Role of Federal Water Pollution Criminal Sanctions*, 11 Am.Crim.L.Rev. 835, 836 (1973) (footnote omitted).

## I.

Frezzo Brothers, Inc., is a Pennsylvania corporation engaged in the mushroom farming business near Avondale, Pennsylvania. The business is family operated with Guido and James Frezzo serving as the principal corporate officers. As a part of the mushroom farming business, Frezzo Brothers, Inc., produces compost to provide a growing base for the mushrooms. The compost is comprised mainly of hay and horse manure mixed with water and allowed to ferment outside on wharves.

The Frezzo's farm had a 114,000 gallon concrete holding tank designed to contain water run-off from the compost wharves and to recycle water back to them. The farm had a separate storm water run-off system that carried rain water through a pipe to a channel box located on an adjoining property owned by another mushroom farm. The channel box was connected by a pipe with an unnamed tributary of the East Branch of the White Clay Creek. The waters of the tributary flowed directly into the Creek.

Counts One through Four of the indictment charged the defendants with discharging pollutants into the East Branch of the White Clay Creek on July 7, July 20, September 20, and September 26, 1977. On these dates Richard Casson, a Chester County Health Department investigator, observed pollution in the tributary flowing into the Creek and collected samples of wastes flowing into the channel box. The wastes had the distinctive characteristics of manure and quantitative analysis of the samples revealed a concentration of pollutants in the water. The Government introduced meteorological evidence at trial showing that no rain had been recorded in the area on these four dates. Based on this evidence, the Government contended that the Frezzos had willfully discharged manure into the storm water run-off system that flowed into the channel box and into the stream.

Investigator Casson returned to the Frezzo farm on January 12, 1978, to inspect their existing water pollution abatement facilities. Guido and James Frezzo showed Casson both the holding tank designed to contain the waste water from the compost wharves, and the separate storm water run-off system. Casson returned to the farm on May 9, 1978 with a search warrant and several witnesses. This visit occurred after a morning rain had ended. The witnesses observed the holding tank overflowing into the storm water run-off system. The path of the wastes from the Frezzo holding tank to the channel box and into the stream was photographed. James Frezzo was present at the time and admitted to Casson that the holding tank could control the water only 95% of the time. Samples were again collected, subjected to quantitative analysis and a high concentration of pollutants was found to be present. This incident gave rise to Count Five of the indictment.

Additional samples were collected from the channel box on May 14, 1978, after a heavy rain. Again, a concentration of pollutants was found to be present. This evidence served as the basis for Count Six of the indictment. At trial, the Government introduced evidence of the rainfall on May 9 and May 14 along with expert hydrologic testimony regarding the holding capabilities of the Frezzos' tank. The Government theorized that the holding tank was too small to contain the compost wastes after a rainstorm and that the Frezzos had negligently discharged pollutants into the stream on the two dates in May.

The jury returned guilty verdicts on all six counts against the corporate defendant, Frezzo Brothers, Inc., and individual defendants, Guido and James Frezzo. The trial court denied the defendants' motions for judgment of acquittal and new trial in a memorandum opinion, *United States v. Frezzo Brothers, Inc.*, 461 F.Supp. 266 (E.D.Pa. 1978).

## II.

The Frezzos first argue that the Administrator of the Environmental Protection Agency must either give them some notice of alleged violations of the Federal Water Pollution Control Act, or institute a

civil action before pursuing criminal remedies under the Act, Judge Broderick, the trial judge, rejected this argument, 461 F.Supp. at 268, relying primarily on *United States v. Phelps Dodge*, 391 F.Supp. 1181 (D. Ariz. 1975), which held that there were no civil prerequisites to the Government's maintenance of criminal proceedings under the Act. We agree.

The enforcement provisions of the Act are contained in 33 U.S.C. § 1319. The criminal provision of the Act, § 1319(c) provides in relevant part:

(1) Any person who willfully or negligently violates section 1311 . . . of this title . . . shall be punished by a fine of not less than $2,500 nor more than $25,000 per day of violation, or by imprisonment for not more than one year, or by both. . . .

This provision is preceded by § 1319(a) dealing with state enforcement and compliance orders, and § 1319(b) governing civil actions. There is conflicting legislative history with respect to whether a compliance order or a civil suit by the Administrator should be a prerequisite to the Government's institution of criminal proceedings under § 1319(c).[2] The district court in *Phelps Dodge*, however, relied on the final House Committee Report which clearly indicated that written notice of the violation, administrative, civil, or criminal remedies under the Act were to be *alternative* remedies. The key portion of the House Committee Report provides:

Whenever on the basis of any information available to him the Administrator finds that anyone is in violation of any of these requirements, he *may* take *any* of the following enforcement actions: (1) he shall issue an order requiring compliance; (2) he shall notify the person in alleged

violation in such state of such finding . . . or (3) he shall bring a civil action; or (4) he shall cause to be instituted criminal proceedings.

*Legislative History, supra* at 801–02 (emphasis supplied). This statement led the court in *Phelps Dodge* to conclude that the Administrator "is not required to proceed first to effect a correction by civil means before instituting criminal proceedings." 391 F.Supp. at 1184. An identical result was reached by the court in *U. S. v. Hudson Farms, Inc.*, 12 E.R.C. 1144, 1146 (E.D.Pa. 1978).[3]

We believe that these cases place a correct gloss on the enforcement provisions of the Act.[4] There is nothing in the text of § 1319(c) that compels the conclusion that prior written notice, other administrative or civil remedies are prerequisite to criminal proceedings under the Act. The Senate acceded to the House in not making civil enforcement mandatory upon the Administrator under section 1319. *Legislative History, supra* at 174. Hence, we can only conclude that whatever support existed for the position urged by the Frezzos did not prevail in the enactment of the final Bill.

Further, we see no reason why the Government should be hampered by prerequisites to seeking criminal sanctions under the Act. The Frezzos urge that it can only be through prior notification, followed by continued polluting in the face of such notice, that willful violations of the Act can be established. We find this argument unconvincing. Although continued discharges after notification could be one way for the Government to prove scienter, it is certainly not the only way to establish willful violations. The Government could logically argue, as it did in this case, that the circum-

---

**2.** Senator Muskie expressed the view in the Senate's consideration of the Conference Committee Report that an abatement order or civil action was mandatory under the Act. A Legislative History of the Federal Water Pollution Control Act Amendments of 1972, U.S. Government Printing Office, at 174. A similar view was espoused by Representative Harsha in the House during debate on the House Bill. *Legislative History, supra* at 530.

**3.** This case was decided after the district court's decision in the present case and hence was not considered by the court reaching its decision.

**4.** For a general review of the 1972 amendments *see* Comment, *The Federal Water Pollution Control Act Amendments of 1972*, 1973 Wis.L. Rev. 893 (1973).

stances surrounding the alleged discharges manifested willful violations of the Act and that it had the power to pursue criminal rather than civil sanctions. Furthermore, in view of the broad responsibilities imposed upon the Administrator of the EPA, he should be entitled to exercise his sound discretion as to whether the facts of a particular case warrant civil or criminal sanctions.[5] We therefore hold that the Administrator of the EPA is not required to pursue administrative or civil remedies, or give notice, before invoking criminal sanctions under the Act.

### III.

The Frezzos next contend that the indictment should have been dismissed because the EPA had not promulgated any effluent standards applicable to the compost manufacturing business. The Frezzos argue that before a violation of § 1311(a) can occur, the defendants must be shown to have not complied with existing effluent limitations under the Act. The district court disagreed, finding no such requirement. 461 F.Supp. at 268–69. We agree with the district court.

The core provision of the Act is found in § 1311(a) which reads:

> Except as in compliance with this section and sections 1312, 1316, 1317, 1328, 1342, and 1344 of this title, the discharge of any pollutants by any person shall be unlawful.

Section 1311(b) then sets out a timetable for the promulgation of effluent limitations for point sources and section 1312 provides for the establishment of water quality related effluent limitations. The Frezzos contend that they cannot have violated the Act because the EPA has not yet promulgated effluent limitations which they can be held to have violated. Appellants rely primarily on *United States v. GAF Corporation*, 389 F.Supp. 1379 (S.D. Texas 1975) as support for their position. That case did hold that before an abatement order may be issued pursuant to § 1319(a)(3) of the Act, the defendants must be shown to have violated an applicable effluent limitation. 389 F.Supp. at 1385–86. The Government argues, however, that the decision is incorrect and cites *American Frozen Food Institute v. Train*, 176 U.S.App.D.C. 105, 113, 539 F.2d 107, 115 (1976) for the proposition that:

> By 1972 Congress determined upon wholly a new approach. The basic concept of the Act [section 1311(a)] we construe in this case is an ultimate flat prohibition upon all discharges of pollutants . . . . .

Indeed, the court specifically noted that "[t]his prohibition which is central to the entire Act is statutory and requires no promulgation." *Id.*, 176 U.S.App.D.C. at 126, 539 F.2d at 128.

The Sixth Circuit has enforced criminal penalties for violation of section 1311(a). In *United States v. Hamel*, 551 F.2d 107, 109 (6th Cir. 1977), the court stated: "The negligent or wilful violation of § 1311(a), however, without justification subjects one to the criminal sanctions [sic] § 1319(c)(1)." The Government contends in the instant case that the lack of effluent limitations is no defense to a violation of § 1311(a). It argues that when no effluent limitations have been established for a particular business, the proper procedure is for the business to apply for a permit to discharge pollutants under 33 U.S.C. § 1342(a), which allows the Administrator to establish interim operating conditions pending approval.[6] The dis-

---

**5.** There is evidence in the Legislative History of the 1972 Amendments to the Act that the new criminal sanctions were designed to strengthen the ability of the Government to pursue criminal remedies for water pollution. *See Legislative History, supra* at 216–17, 663, 1481–82. Further, Glenn indicates that: "One of the prevalent feelings of the Congress during consideration of the enforcement aspects of the 1972 Amendments was that the enforcement mechanism of the previous law [Rivers and Harbors Act of 1899, commonly known as the Refuse Act] did not allow (or require) prompt enforcement action." Glenn, *supra* note 2, at 866 n. 140. Thus, it is evident that prerequisites to the pursuit of criminal sanctions under the Act would be inconsistent with Congress' desire for a stronger enforcement mechanism.

**6.** 33 U.S.C. § 1342(a)(1) provides in relevant part:

trict court in *GAF* explicitly rejected this argument as placing too harsh a burden on the defendant because it viewed the Act as not allowing any discharge pending approval of the permit. 389 F.Supp. at 1386. The Government contends in the present case, however, that the absence of effluent limitations should not be allowed to nullify the flat prohibition on discharges under § 1311(a). We agree.

The *GAF* court appropriately recognized that the legislative history of the Act was "curiously incomplete" on the issue in question. *Id.* We therefore must interpret the statute in a fashion that best effectuates the policies of the Act. The basic policy of the Act is to halt uncontrolled discharges of pollutants into the waters of the United States. 33 U.S.C. § 1251. In fact, the Act sets forth "the national goal that the discharge of [all] pollutants into the navigable waters be eliminated by 1985." *Id.* § 1251(a)(1); *United States v. Hamel, supra* at 109. We see nothing impermissible with allowing the Government to enforce the Act by invoking § 1311(a), even if no effluent limitations have been promulgated for the particular business charged with polluting. Without this flexibility, numerous industries not yet considered as serious threats to the environment may escape administrative, civil, or criminal sanctions merely because the EPA has not established effluent limitations. Thus, dangerous pollutants could be continually injected into the water solely because the administrative process has not yet had the opportunity to fix specific effluent limitations. Such a result would be inconsistent with the policy of the Act.

We do not believe, as did the court in *GAF*, that the permit procedure urged by the Government is unduly burdensome on business. If no effluent limitations have yet been applied to an industry, a potential transgressor should apply for a permit to discharge pollutants under section 1342(a).

The Administrator may then set up operating conditions until permanent effluent limitations· are promulgated by EPA. The pendency of a permit application, in appropriate cases, should shield the applicant from liability for discharge in the absence of a permit. 33 U.S.C. § 1342(k). *See Stream Pollution Con. Bd. of Ind. v. U. S. Steel Corp.*, 512 F.2d 1036, 1041 n. 12 (7th Cir. 1975). EPA cannot be expected to have anticipated every form of water pollution through the establishment of effluent limitations. The permit procedure, coupled with broad enforcement under § 1311(a) may, in fact, allow EPA to discover new sources of pollution for which permanent effluent standards are appropriate.

█ In the present case, it is undisputed that there was no pending permit to discharge pollutants; nor had Frezzo Brothers, Inc., ever applied for one. This case, therefore, appears to be particularly compelling for broad enforcement under sections 1311(a), 1319(c)(1). The Frezzos, under their interpretation of the statute, could conceivably have continued polluting until EPA promulgated effluent limitations for the compost operation. The Government's intervention by way of criminal indictments brought to a halt potentially serious damage to the stream in question, and has no doubt alerted EPA to pollution problems posed by compost production. We therefore hold that the promulgation of effluent limitation standards is not a prerequisite to the maintenance of a criminal proceeding based on violation of section 1311(a) of the Act.

## IV.

█ The Frezzos next contend that there was insufficient evidence to convict them of the charges in the indictment. They virtually concede that the Government presented sufficient evidence to sustain Count Five. However, defendants charge that the

---

[T]he Administrator may, after opportunity for public hearing, issue a permit for the discharge of any pollutant, notwithstanding section 1311(a) of this title, upon condition that such discharge will meet all applicable requirements . . . ., or prior to the taking of necessary implementing actions relating to all such requirements, such conditions as the Administrator determines are necessary to carry out the provisions of this chapter.

Government, *inter alia*,[7] had failed to prove willful or negligent discharges of pollutants. We disagree because we are persuaded that substantial evidence in the record supports all six counts of the indictment.[8]

The Government contended at trial that the discharges giving rise to Counts One through Four of the indictment were willful. To establish this claim, the Government relied on the samples collected on those four occasions, the absence of rain on the dates in question, and the elimination of other possible causes for the pollution. The Frezzos maintain that the Government on this evidence failed to establish a willful act. We disagree. The jury was entitled to infer from the totality of the circumstances surrounding the discharges that a willful act precipitated them. The Government did not have to present evidence of someone turning on a valve or diverting wastes in order to establish a willful violation of the Act.[9]

The Government's theory on Counts Five and Six was that the discharges were negligently caused by the inadequate capacity of the holding tank. Count Five was amply supported by eyewitness testimony, samples of the pollutants, evidence of rainfall and expert hydrologic evidence of the holding tank's capacity. Count Six was similarly supported by evidence of rainfall, samples, expert testimony and photographs of the holding tank three days before the incident, showing it to be near capacity. The jury could properly have concluded that the water pollution abatement facilities were negligently maintained by the Frezzos and

were insufficient to prevent discharges of the wastes. We therefore conclude that there was sufficient evidence to sustain the verdict on all six counts.

## V.

Defense counsel requested at trial that a special verdict be submitted to the jury in order to determine, if a guilty verdict were returned, whether the jury found the defendants guilty of a willful or a negligent violation under each count. The trial judge denied the request. The Frezzos maintain that this denial constitutes reversible error. We cannot agree.

We start with the proposition that special verdicts are generally disfavored in criminal cases. *United States v. Munz*, 542 F.2d 1382, 1389 (10th Cir. 1976), *cert. denied*, 429 U.S. 1104, 97 S.Ct. 1133, 51 L.Ed.2d 555 (1977); *United States v. Jackson*, 542 F.2d 403, 412 (7th Cir. 1976). There is the belief that in the long run special verdicts are not favorable to defendants because "[b]y a progression of questions each of which seems to require an answer unfavorable to the defendant, a reluctant juror may be led to vote for a conviction which, in the large, he would have resisted." *United States v. Spock*, 416 F.2d 165, 182 (2d Cir. 1969). *See United States v. McCracken*, 488 F.2d 406, 419 (5th Cir. 1974).

The defendants maintain nevertheless, that it was important for the court to know whether the discharges were found to be willful or negligent under each Count, in order to assess the sufficiency of the evi-

---

7. The defendants also argued that the Government failed to produce sufficient evidence to identify them as the parties responsible for the discharges. We believe the district court correctly concluded, 461 F.Supp. at 270–71, that sufficient evidence of identification was produced at trial.

8. Judge Broderick stated in denying the defendants' motions for acquittal and a new trial:

The Government's case was strong, and there can be no doubt that the evidence was sufficient to support the jury's verdict as to each of the defendants and as to each of the six counts of the indictment.

461 F.Supp. at 270.

9. Judge Broderick noted:

Testimony was presented by several witnesses that on many occasions, commencing as far back as 1970, the defendants in this case had been investigated, visited and confronted by a number of state and county employees concerning the fact that the stream in question was being polluted by runoff from the compost operation conducted by the defendants on the Frezzo property. 461 F.Supp. at 270.

dence and for sentencing purposes. The Government, however, proceeded on a theory of willful discharge under Counts One through Four and on a theory of negligent discharge under Counts Five and Six. We have already noted our agreement with the district court's conclusion that the evidence was sufficient to sustain each of the counts on those theories. Hence, although a special verdict might have been illuminating, there was no compelling necessity for one in this case. Further, there is no variance in the statutory penalty between willful and negligent violations. It therefore would have been within the judge's discretion to sentence the defendants to the statutory maximum had the jury returned a special verdict finding the defendants guilty of negligent violations only. Indeed, it appears that the judge might have done so since he sentenced the defendants more severely under the negligent counts.[10] We therefore conclude that the trial judge did not abuse his discretion in declining to submit a special verdict in the instant case.

Appellants raise other contentions on appeal all of which are without merit.[11] We perceive no prejudice to the defendants meriting reversal of the verdict and the grant of a new trial. Accordingly, the judgment of the district court will be affirmed.

**10.** The jail sentences were imposed only for Count Five and the defendants were more heavily fined under Counts Five and Six.

**11.** Defendants contend that the trial judge improperly instructed the jury that they could be found guilty as individuals when the indictment charged them with acting as corporate officers. The Government argued the case on the "responsible corporate officer doctrine" recognized by the United States Supreme Court in *United States v. Park*, 421 U.S. 658, 95 S.Ct. 1903, 44 L.Ed.2d 489 (1974) and *United States v. Dotterweich*, 320 U.S. 277, 64 S.Ct. 134, 88 L.Ed. 48 (1943). We have examined the judge's charge and we perceive no error in the instruction to the jury on this theory.

Defendants also contend that the district court erred in failing to suppress the samples from the channel box because they were taken without a search warrant. However, the channel box lay on property not owned by the Frezzos. The district court held that because defendants had no legitimate proprietary or

possessory interest in the neighboring property and because possession was not an element of the offense charged, they lacked standing under the fourth amendment to contest the seizure of the samples. The United States Supreme Court, however, in *Rakas v. Illinois*, 439 U.S. 128, 138–139, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), dropped the issue of standing from consideration in fourth amendment cases in favor of an inquiry into the extent of an individual defendant's rights under the fourth amendment. Nevertheless, it is still clear under *Alderman v. United States*, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969) that fourth amendment rights are personal and cannot be vicariously asserted. We agree that defendants had no proprietary or possessory interest in the searched premises nor was possession an element of the offense. Hence, there are no personal rights that may be substantively asserted under the fourth amendment. *Rakas, supra*, 439 U.S. at 140–141, 99 S.Ct. 421.