642 F.2d 59
 15 ERC 1733, 11 Envtl. L. Rep. 20,914
 UNITED STATES of America
v.
FREZZO BROTHERS, INC.
UNITED STATES of America
v.
FREZZO, Guido
UNITED STATES of America
v.
FREZZO, James L.
Frezzo Brothers, Inc., Guido Frezzo and James L. Frezzo, Appellants.
 No. 80-2141.
 United States Court of Appeals,
Third Circuit.
 Argued Jan. 20, 1981.
Decided March 4, 1981.
As Amended March 18, 1981.
Rehearing Denied May 11, 1981.
 
 Thomas Colas Carroll (argued), John Rogers Carroll, Carroll & Carroll, Philadelphia, Pa., for appellants.
 Bruce J. Chasan, Asst. U. S. Atty. (argued), Peter F. Vaira, U. S. Atty., Walter S. Batty, Jr., Asst. U. S. Atty., Chief, Appellate Section, Philadelphia, Pa., for appellee.
 Before GIBBONS, VAN DUSEN and WEIS, Circuit Judges.
 OPINION OF THE COURT
 VAN DUSEN, Senior Circuit Judge.
 
 
 1
 Guido and James Frezzo and the corporation Frezzo Brothers, Inc., petitioned under 28 U.S.C. § 2255 (1976)[1] for relief from their convictions for discharging pollutants into navigable waters without a permit. The district court denied the petitions. United States v. Frezzo Bros., Inc., 491 F.Supp. 1339 (E.D.Pa.1980).[2] We have jurisdiction under 28 U.S.C. § 1291 (1976) to decide the appeal from this final order. We reverse the denial of the petitions and remand for further proceedings.
 
 
 2
 This court's prior opinion in United States v. Frezzo Bros., Inc., 602 F.2d 1123, 1124-25 (3d Cir. 1979), cert. denied, 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756 (1980), which affirmed the convictions, sets out in detail the facts which led to the original trial. Petitioners grew mushrooms and prepared compost for growing mushrooms. Petitioners stated that after compost is prepared, it is pasteurized to remove ammonia, and then mushrooms are grown in the pasteurized compost. Joint Memorandum of Law in Support of Motions for Collateral Relief, A-23, A-39. On certain dates in 1977-1978, their holding tank containing runoff from the compost overflowed due to heavy rains. The overflow discharged manure and other pollutants through a runoff system into a creek which joins the Delaware River. A jury convicted each of the petitioners on all six counts of discharging pollution "from mushroom compost manufacturing operations"[3] without a permit in violation of 33 U.S.C. §§ 1311(a) and 1319(c) (1976).[4]
 
 
 3
 The petitions now on appeal claimed that the discharges from the holding tank did not require a permit due to the exclusion in 40 C.F.R. §§ 125.4(i) and 125.53(a) (1978) (repealed).[5] These regulations exempted certain agricultural pollution from the statutory permit requirement.[6] The Government moved for summary judgment.[7] The district court did not explicitly grant the motion for summary judgment, but it denied the petitions without considering any evidence.[8] It did not decide whether the pollution was agricultural. It held that petitioners were required to obtain a permit, even if the pollution was agricultural.[9]
 
 
 4
 We decide on this appeal only whether the convictions for the discharges from the holding tank, assuming this pollution was from agricultural activities and not from agricultural point sources (see text of regulations on page 61), were consistent with the literal words of the regulations. We conclude that, in light of such assumption, the convictions were not consistent with the regulations. Since we remand for the district court to determine whether the pollution was agricultural, see below, we do not decide the underlying Sixth Amendment claim on this appeal. See note 6 supra.
 
 
 5
 This court would not affirm criminal convictions if the conduct was not illegal under the plain language of the applicable regulations.[10] Thus, we turn to the literal words of the EPA regulations. These rules excluded agricultural pollution, except for discharges from "agricultural point sources," from the permit requirement. Section 125.4(i) of the regulations stated:
 
 
 6
 "The following do not require an NPDES permit:
 
 
 7
 "(i) Water pollution from agricultural and silvicultural activities, including runoff from orchards, cultivated crops, pastures, rangelands, and forest lands, except that this exclusion shall not apply to the following:
 
 
 8
 "(3) Discharges from agricultural point sources as defined in § 125.53, ...."
 
 Section 125.53 read:
 
 9
 "s 125.53 Agricultural activities.
 
 
 10
 "(a) Definitions. For the purpose of this section:
 
 
 11
 "(1) The term 'agricultural point source' means any discernible, confined and discrete conveyance from which any irrigation return flow is discharged into navigable waters.
 
 
 12
 "(2) The term 'irrigation return flow' means surface water, other than navigable waters, containing pollutants which result from the controlled application of water by any person to land used primarily for crops, forage growth, or nursery operations.
 
 
 13
 "(3) The term 'surface water' means water that flows exclusively across the surface of the land from the point of application to the point of discharge."
 
 
 14
 All parties agree that the discharges of manure from the holding tank were not irrigation return flows as defined in section 125.53(2). The literal language of section 125.53(1) stated that conveyances of irrigation return flows were the only agricultural point sources. Thus, the system discharging the manure was not an agricultural point source under the regulations. Section 125.4(i) appeared to state that no agricultural pollution required a permit with a single exception: pollution from agricultural point sources. Since petitioners' discharges were not from agricultural point sources, the pollution would not have required a permit (assuming the pollution was agricultural).
 
 
 15
 The district court avoided the effect of this language in the regulations by relying on the administrative history.[11] It held that the holding tank was an agricultural point source even though the tank was not conveying irrigation return flows. We do not believe that the administrative history supports this holding.[12] Statements accompanying the proposed rules (which later became effective) read:
 
 
 16
 "INTENT OF REGULATIONS
 
 
 17
 "The intent of the regulations is to exclude from the NPDES permit program all natural runoff from agricultural land which results from precipitation events. Because most water pollution related to agricultural activities is caused by runoff resulting from precipitation events and is nonpoint in nature, it is not and should not be subject to the NPDES permit program as it has been administered to date."
 
 
 18
 41 F.R. 7694 (1976). Precipitation apparently was a cause of the runoff from the holding tank. Frezzo Bros., 602 F.2d at 1125. Other statements in the Federal Register indicate that, under the regulations, all agricultural pollution was caused by either (1) precipitation or (2) irrigation return flows.
 
 
 19
 "Thus, in formulating the criteria for defining agricultural point sources EPA has specifically excluded those sources that may be furrows, ditches, and drains channeling natural runoff, and specifically included irrigation return flow ditches and drains that convey water resulting from its controlled application by man to navigable waters. When water pollution from irrigation ditches results from precipitation events, that pollution is nonpoint in nature. However, when discharges from irrigation ditches result from the controlled application of water by any person, that pollution is considered a point source and subject to the program proposed herein."
 
 
 20
 Id.[13] This passage sets out two categories of agricultural pollution. The district court appears to have created a third category of agricultural pollution: discharges not resulting from irrigation return flows yet still requiring a permit. We decline to uphold the denial of the section 2255 petitions on this record, since that denial was based on this third category. We hold that, if petitioners' discharges were agricultural pollution, then petitioners needed no section 402 permit under the language in the former regulations.[14]
 
 
 21
 None of the parties has raised on this appeal the issue whether the pollution was in fact agricultural;[15] the parties have given no indication that they wish this court to decide the issue. The petitions in the district court raised this issue, but that court never decided whether the pollution was agricultural. The district court has heard no evidence[16] and this is an issue of fact. Deciding the issue against either party would be unfair without giving them an opportunity to present evidence and develop a record. Since the record at this stage[17] is insufficient for this panel to decide whether agricultural pollution was present here, we will remand the case for further proceedings.
 
 
 22
 The judgment of the district court will be reversed and the case remanded for further proceedings consistent with this opinion.
 
 
 
 [1]
 The corporation, as opposed to the individual petitioners, petitioned for a writ of error coram nobis
 
 
 [2]
 This opinion details the procedural history of the case. Id. at 1340
 
 
 [3]
 Indictment, United States v. Frezzo Brothers, Inc., 491 F.Supp. 1339 (E.D.Pa.1980)
 
 
 [4]
 The first district court opinion after the trial, which denied defendants' motions for acquittal or a new trial, provides further background facts. United States v. Frezzo Brothers, Inc., 461 F.Supp. 266 (E.D.Pa.1978), aff'd, 602 F.2d 1123 (3d Cir. 1979), cert. denied, 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756 (1980)
 
 
 [5]
 The Environmental Protection Agency (EPA) repealed these regulations on June 7, 1979, in 44 F.R. 32948, effective August 13, 1979, but they were in effect during the alleged discharges of pollutants. For the text of such regulations, see p. 61
 
 
 [6]
 See note 14 infra. Petitioners never raised the agricultural exemption at the original trial or on direct appeal to this court. They first raised it in a petition for rehearing before the original panel, which denied the petition on October 22, 1979. Appellee's brief, Exh. B. The section 2255 petition alleged that petitioners' original counsel was incompetent under Sixth Amendment standards in failing to raise the exemption at the first trial. Because of this Sixth Amendment issue, consideration of the agricultural exemption for the first time on this collateral attack is required
 
 
 [7]
 It conceded, solely for the decision on that motion, that the pollution was agricultural, and argued that the petitioners nevertheless were required to obtain a permit
 "At this stage the court is not concerned with whether or not the Frezzo compost manufacturing operation is an 'agricultural' activity. We may assume that it is. The Government's position is that an agricultural point source is subject to the permit requirement of the Act, 33 U.S.C. § 1342. If the court construes the regulation in issue in the manner urged by the defendants, then an evidentiary hearing will be required to afford the defendants an opportunity to prove that their compost operations constitute 'agriculture.' "
 Government's Memorandum of Law in Support of Motions for Summary Judgment and Dismissal at 7 (A-51).
 
 
 [8]
 See note 16 infra
 
 
 [9]
 The court stated:
 "Although there is a question as to whether the manufacturing of mushroom compost is an 'agricultural activity,' there is no question that the regulations do not and did not exempt the discharge of the pollutants...."
 Frezzo Bros., 491 F.Supp. at 1342.
 
 
 [10]
 The Government argues that the plain language of the regulations conflicts with the statute. Since this is a criminal case, petitioners were entitled to rely on the language of the regulations. Those rules must have provided fair notice of what conduct violated the law. Therefore, we need not decide whether the regulations defining agricultural point sources conflicted with the statutory definition of "point source" or whether the regulations were invalid for that reason under Natural Resources Defense Council, Inc. v. Costle, 568 F.2d 1369 (D.C.Cir.1977). The statute reads:
 "(14) The term 'point source' means any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged. This term does not include return flows from irrigated agriculture."
 33 U.S.C.A. § 1362(14) (1978). Pub.L.No.95-217, § 33(b), 91 Stat. 1577 (1977), added the last sentence. The amendment effectively eliminated the distinction in 40 C.F.R. § 125.53 (1978) (repealed) by also excluding irrigation return flows from the permit requirement.
 We do not decide whether the Government's position on the meaning of the statute and the regulations would prevail in a civil action for an injunction.
 
 
 [11]
 "The administrative history of these regulations, as reported in the Federal Register, 41 Fed.Reg. 7963 (1976), explicitly states that the sole intent of sections 125.4(i) and 125.53 of these regulations was to make it clear that the return flow of water used for irrigation purposes which contained pollutants was not exempt from the permit requirements of the Act. These sections of the regulations specifically subjected the return flow of irrigation water to the permit requirements of the Act, and exempted the natural runoff of rain water from these permit requirements
 "The record in this case clearly shows that the discharge of pollutants for which the petitioners were convicted was not from the natural runoff of rain water from the petitioners' land."
 
 
 [491]
 F.Supp. at 1342
 
 
 [12]
 Even if we agreed that the administrative history supported the district court, we would hesitate to go beyond the literal language of the regulations to uphold a criminal conviction. See note 10 supra
 
 
 [13]
 When the regulations became effective, the Administrator wrote:
 "EPA took the approach in the proposed regulations for agricultural activities of distinguishing water applied to the land through the control of any person (irrigated farming) from water reaching the land as a result of precipitation (dry land farming). Thus where the application of water by any person to agricultural land results in the discharge of pollutants into navigable waters, such discharge is subject to the NPDES permit program; where the discharge of pollutants is induced by precipitation, the permit program is not applicable.
 
 
 [41]
 F.R. 28494-95 (1976)
 
 
 [14]
 The only permit requirement we consider here is for the specific permits under § 402 of the Federal Water Pollution Control Act Amendments of 1972, 33 U.S.C. § 1342 (1976)
 
 
 [15]
 Appellants' "STATEMENT OF THE ISSUES PRESENTED" reads:
 "Did The District Court Err In Holding, On Appellants' Motion For Post-Conviction Relief, That Appellants' Activities Leading To Their Convictions For Discharge Of Water Pollutants Without A Permit Were Not Colorably Within The 'Agricultural Exclusion' To The Permit Requirement And, Therefore, Appellants Were Not Denied The Effective Assistance of Counsel By The Failure Of Trial Counsel To Call The Court's Attention To The Exclusion?
 "Appellants' Joint Brief at 2. Appellee's "QUESTIONS PRESENTED" states:
 "1. Was the discharge of pollutants from appellants' undisputed point source, albeit one which is arguably 'agricultural' in nature, excluded from the permit program under § 402 of the Clean Water Act by virtue of either § 208 of the Act or the regulation at 40 C.F.R. § 125.4(i) (1978)?
 "2. Were appellants denied effective assistance of counsel by virtue of the fact that their trial counsel did not raise the foregoing issue?"
 Appellees' Brief at 2.
 
 
 [16]
 The only evidence in this section 2255 civil proceeding is an affidavit. A-53 to A-56. The only part of the affidavit relevant to the agricultural issue states "I was aware that three other companies that manufactured compost, Frezzo Brothers, Inc., ...." A-56 at No. 8
 
 
 [17]
 See n.16 supra