United States Court of Appeals
For the First Circuit


No. 96-2188

UNITED STATES OF AMERICA,

Appellee,

v.

PEDRO RIVERA,

Defendant, Appellant.



APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Hector M. Laffitte, U.S. District Judge] 



Before

Torruella, Chief Judge, 
Coffin, Senior Circuit Judge, 
Selya, Boudin, Stahl and Lynch, Circuit Judges. 


Rafael Castro Lang and Rachel Brill for appellant. 
Andrew C. Mergen with whom Anne S. Almy, Charles A. De Monaco, 
Michael J. Woods, David C. Shilton, Peter A. Appel, Lisa E. Jones, 
Lois J. Schiffer, Assistant Attorney General, Environment & Natural 
Resources Division, Guillermo Gil, United States Attorney, Jorge E. 
Vega-Pacheco, Assistant United States Attorney, and Miguel A. Pereira, 
Assistant United States Attorney, were on brief for appellee.
James F. Moseley, Patrick J. Bonner, and Robert B. Parrish on 
brief for Maritime Law Association, amicus curiae.


OPINION EN BANC


December 2, 1997


COFFIN, Senior Circuit Judge. Appellant Pedro Rivera COFFIN, Senior Circuit Judge 

appeals his conviction under 46 U.S.C. 10908 for knowingly

sending a vessel to sea in an unseaworthy condition likely to

endanger the life of an individual. He alleges that his

prosecution was invalid, that the evidence was insufficient, and

various trial errors. After a divided panel of this court

affirmed the conviction, we ordered en banc hearing on the 

statutory and sufficiency issues. We now find the prosecution to

be proper, but conclude that the evidence adduced was

insufficient to establish that Rivera knew that the vessel's

condition was "likely to endanger the life of an individual."

The judgment of conviction therefore must be reversed.1

I. Background 

This case arises out of a major oil spill that occurred

during the night of January 6-7, 1994 off the coast of San Juan,

Puerto Rico. The accident occurred after the tow wire connecting

the tugboat Emily S. to the barge Morris J. Berman parted; the 

barge subsequently ran aground, spilling its oily cargo.

Appellant Rivera was the general manager of the Bunker Group,

which managed the tugboat.

On the night of the accident, Rivera had directed the crew

of the Emily S. to transport the Morris J. Berman from San Juan 

to Antigua. Although various crew members of the Emily S. 

 

1 The asserted trial errors were not certified for en banc 
review, and the panel's rejection of them therefore is not before
us. Because our disposition renders those errors moot, we do not
need to re-adopt that portion of the withdrawn opinion. 

-2-

previously had told Rivera of the towing wire's seriously

deteriorated condition, and although a new wire had been ordered

and was available,2 the voyage proceeded with the old wire in

place. Shortly after the vessel left San Juan Harbor, the wire

parted. Captain Roy McMichael repaired the wire, but did not use

a thimble, a device that prevents abrasion in a repaired section

of wire. Several hours later, the wire parted again; the barge

drifted off and went aground.

Rivera was found guilty by a jury of violating 46 U.S.C. 

10908 for knowingly sending the Emily S. to sea in an unseaworthy 

condition likely to endanger life.3 We review his conviction on

both statutory and evidentiary grounds.

II. Interpretation of 46 U.S.C. 10908 

The first question certified for en banc consideration is 

one of statutory interpretation: was Rivera's prosecution under

section 10908 flawed because certain procedural prerequisites

were not met? Section 10908 provides as follows:

A person that knowingly sends or attempts to send,
or that is a party to sending or attempting to send, a
vessel of the United States to sea, in an unseaworthy
state that is likely to endanger the life of an
individual, shall be fined not more than $1,000,
imprisoned for not more than 5 years, or both.

 

2 The wire apparently was not installed before the trip
because workers were unavailable as a result of the Three Kings'
holiday. 

3 The jury also convicted Rivera for knowingly violating a
Coast Guard regulation, see 33 U.S.C. 1232(b)(1), but the 
district court later granted Rivera's motion for acquittal on
that count.

-3-

This is the final provision in Chapter 109 of Title 46. The

chapter, entitled "Proceedings on Unseaworthiness," focuses

primarily on procedures to be used by seamen to report

unseaworthy vessels. Rivera maintains that these procedures must

be instituted before a criminal prosecution may be brought under

section 10908. The government argues that section 10908 is a

freestanding statute that on its own provides a basis for

criminal liability.

To resolve this dispute, we must confront three major

analytical issues: (1) to what extent should the context of

section 10908 within Chapter 109 guide our interpretation of its

language? (2) what role should be played by legislative history?

(3) is our interpretation "palpably unreasonable"? We address

each of these substantial issues in Section A below, and briefly

note in Section B inconsistencies in this area of law that we

believe deserve the attention of Congress.

A. An Examination of Context, Legislative History, and 

Reasonableness. 

We enter our analysis by noting that the interpretation of a

statute presents a purely legal question, and thus our review is

de novo. See Strickland v. Commissioner, 96 F.3d 542, 545 (1st 

Cir. 1996).

(1) Plain Language or Beyond? The well established approach 

to statutory construction begins with the actual language of the

provision, Landreth Timber Co. v. Landreth, 471 U.S. 681, 685 

(1985). When the "plain meaning" is clear on its face, "the sole

-4-

function of the courts is to enforce it according to its terms." 

Caminetti v. United States, 242 U.S. 470, 485 (1917); United 

States v. Bohai Trading Co., 45 F.3d 577, 581 (1st Cir. 1995). 

From one vantage point, this is the beginning and the end of our

analysis. On its face, there is nothing unclear about the

meaning of section 10908. Its language does not limit its

application to "a person" against whom Chapter 109 proceedings

have been brought. Rather, it sets out three specific

requirements for finding a person culpable: (1) knowingly sending

a vessel to sea; (2) knowing that the vessel was in an

unseaworthy condition; and (3) knowing that the unseaworthiness

was such that it would likely endanger life. Straightforward

application of the plain language rule leaves no place for the

procedural prerequisites asserted by Rivera. 

There is, however, a respectable contrary view that reading

Chapter 109 as a whole leads to a different understanding of

section 10908. From this perspective, section 10908 is designed

to enhance the complaint procedures outlined in the preceding

sections by criminalizing a knowing attempt to take a dangerous

vessel to sea after an official finding of unseaworthiness or the

lodging of a complaint pursuant to those sections.4
 

4 Chapter 109 was enacted in 1983 as Public Law 98-89. It
provides for the filing of a complaint with the master of a
vessel by the "chief and second mates or a majority of the crew,"
before a voyage takes place, if the vessel appears unfit to the
seaman, 46 U.S.C. 10902(a)(1). A master receiving such a
complaint is then required to apply to a district court of the
United States for the appointment of "3 experienced and skilled
marine surveyors to examine the vessel for the defects or
insufficiencies complained of." Id.; id. at 10903(a). After 

-5-

Rivera maintains that this contextual interpretation of

section 10908 is supported by a reading of the statutory

provisions from which Chapter 109 is derived, 46 U.S.C. 653-

658. Those provisions, originally enacted in 1840, were amended

in 1983 for the primary purpose of re-organizing the then-

existing maritime legislation on the safety of vessels and

protection of seamen into a more comprehensible and easily

administered scheme. See H.R. Rep. No. 98-338, at 113 (1983), 

reprinted in 1983 U.S.C.C.A.N. 924, 925. Former section 658 

consisted of four sentences, the next-to-last of which, with

minor revision, became new section 10908.5
 

their investigation, the surveyors must make a report stating
whether the vessel is fit and, if not, must make appropriate
recommendations as to how to render the vessel seaworthy. Id. at 
10903(a). The district court then passes upon the report and
renders its judgment, which must be complied with by the master
and crew of the vessel. Id. at 10903(b). The remaining 
sections of Chapter 109 detail further consequences: section
10905 provides for the filing of complaints in foreign ports;
section 10906 provides for the discharge of the crew upon a
finding of the vessel's unsuitability; section 10907 prohibits a
master from interfering with a seaman's right to file a complaint
under this chapter. Finally, section 10908, the provision at
issue here, provides for criminal sanctions.

5 The opening two sentences of section 658 were linked in
content to the preceding provisions on the appointment of vessel
inspectors by consular officials in foreign ports, and specified
when such an official should discharge a crew on account of
unseaworthiness. The third sentence began as follows:

If any person knowingly sends or attempts to send or is
party to the sending or attempting to send an American
ship to sea, in the foreign or coastwise trade, in such
an unseaworthy state that the life of any person is
likely to be thereby endangered, he shall, in respect
of each offense, be guilty of a misdemeanor, and shall
be punished by a fine not to exceed $1,000 or by
imprisonment not to exceed five years, or both, . . . .

-6-

Rivera points particularly to the word "such" in the final

portion of section 658 -- the reference to sending a ship to sea

in "such an unseaworthy state" -- as evidence that criminal such

liability was intended only when a finding of unseaworthiness as

specified in the prior sections was made. Although that portion

of section 658 was separately codified as section 10908 as part

of the 1983 amendments, and the word "such" was deleted, Rivera

maintains that the context makes clear that the focus on

unseaworthiness remained the same: criminal liability under

section 10908 is applicable only when unseaworthiness is found

pursuant to the preceding procedural mechanisms.

We have difficulty drawing so much from the context here.

While cognizant of "the cardinal rule that a statute is to be

read as a whole . . . , since the meaning of statutory language,

plain or not, depends on context," Conroy v. Aniskoff, 507 U.S. 

511, 515 (1993) (citations omitted), we gain no insight from the

surrounding text in this instance. Indeed, the relevant

"context" is subject to different interpretations. Rivera argues

that the backdrop is a multi-part procedural scheme for making

determinations of unseaworthiness based on claims brought

primarily by seamen. The government takes a broader view,

describing the context simply as a set of provisions concerning

unseaworthiness, with the criminal prosecution serving as an

 

The next clause of the sentence provided a defense to the
violation based on reasonableness.

-7-

appropriately harsh penalty for a limited category of individuals

who knowingly put lives in jeopardy.

Both of these frameworks are consistent with what we see as

the overall purpose of the legislation -- to protect seamen --

and we therefore find no aid to construction in the provisions

surrounding section 10908.6 Nor does a focus on the word "such,"

as Rivera urges, move us beyond the plain language. Although we

believe the use of "such" in the old statute appears almost

certainly to look forward to the extent of unseaworthiness

necessary to trigger liability, rather than back to a preceding

finding, there is no room for argument that the language in the

recodified provision is ambiguous. Taking section 10908 at face

value, without limitations, avoids any uncertainty.7

 

6 Context plays a larger role when a literal reading of the
language at issue would do violence to the overall scheme. See 
United States v. Falvey, 676 F.2d 871, 875 (1st Cir. 1982) 
("[C]ourts are not bound to read a statute literally in a manner
entirely at odds with its history and apparent intent.") 
Construing section 10908 as a stand-alone provision not only
supports Chapter 109's overall purpose of protecting seamen but
also promotes Congress's apparent intent to increase
responsibility for life-threatening accidents. See infra at 11.  

7 This is not unlike the conflict between Justices Brennan
and Powell in Maine v. Thiboutot, 448 U.S. 1 (1980). Justice 
Brennan's majority opinion held that the phrase "and laws" in 42
U.S.C. 1983 encompassed violations of all federal statutory as
well as constitutional laws, while Justice Powell in dissent
asserted that the context clearly confined coverage of the
provision to, at most, statutes providing specifically for
equality of rights. As did the majority there, we think the
better approach, in the absence of clear guidance to the
contrary, is to accept the provision as written, without reading
in unstated limitations. 

-8-

Our conviction that we should not look beyond the plain

language of section 10908 is only strengthened when we examine

both the limited legislative history of the provision and the

rationality of this interpretation.

(2) The Role of Legislative History. Keeping in mind that 

resort to legislative history typically is inappropriate when the

meaning of a statute is plainly discernible from its words, see 

Laracuente v. Chase Manhattan Bank, 891 F.2d 17, 23 (1st Cir. 

1989), we engage in this discussion solely to reinforce our

conclusion that this case is best resolved through reliance on

the plain language rule. In a case such as this, where the

"statute's text is encompassing, clear on its face, and

productive of a plausible result," State of Rhode Island v. 

Narragansett Indian Tribe, 19 F.3d 685, 698 (1st Cir. 1994), our 

inquiry, at most, should be aimed at determining "`whether there

is a "clearly expressed legislative intention" contrary to [the

statutory] language, which would require [the court] to question

the strong presumption that Congress expresses its intent through

the language it chooses.'" Id. (quoting INS v. Cardoza-Fonseca, 

480 U.S. 421, 432 n.12 (1987)).

The signals here are mixed. While the stated purpose of the

legislation was simply to recodify in an organized fashion the

then-existing law relating to the safety of vessels and

protection of seamen8 -- suggesting that no changes were intended

 

8 House Report No. 98-338 states:

-9-

-- the accompanying House Report anticipated questions about

substantive revisions:

[T]he bill . . . does in fact make a great many 
substantive changes to the present law. Those changes 
are all either minor changes, adjustments, or
modifications, or they are more significant changes to 
which the Committee received no objection and which the
Committee believed would enhance the clarity and
effectiveness of the law and the [sic] generally
accepted by the industry. Thus, if a comparison of the
language of this bill with the existing law shows that
a substantive change has resulted, it should be 
understood that that change was intended by the 
Committee. The Committee intends and hopes that the 
interpretation of the maritime safety laws as codified
and enacted by this bill will be based on the language
of the bill itself. The bill, as reported, is based on
that premise. There should, therefore, be little or no
occasion to refer to the statutes being repealed in
order to interpret the provisions of this bill.
The Committee also feels, as the courts have held,
that the literal language of the statute should control
the disposition of the cases. There is no mandate in 
logic or in case law for reliance on legislative 
history to reach a result contrary to the plain meaning 
of the statute, particularly where that plain meaning 
is in no way unreasonable.

H.R. Rep. No. 98-338, at 120 (1983), reprinted in 1983 

U.S.C.C.A.N. 924, 932 (emphasis added). Thus, the argument that

Chapter 109 must be interpreted to contain exactly the same

content as the provisions it replaced is met head-on by the

report's statement to the contrary.

 

The ultimate aim of this legislation is three fold: to
make maritime safety and seamen protection law easier
for the Coast Guard to administer, to make it less
cumbersome for the maritime community to use, and to
make it more understandable for everyone involved.

H.R. Rep. No. 98-338, at 113, reprinted in 1983 U.S.C.C.A.N. 924, 
925.

-10-

Additionally, as the government asserts, it is by no means

clear that former section 658 required a civil adjudication of

unseaworthiness as a prerequisite to a criminal prosecution.

Although it was included within the same section as instructions

for the discharge or retention of a crew in a foreign port after

a survey of vessel conditions, the criminal provision was phrased

generally and did not reference a civil adjudication of

unseaworthiness. As we noted earlier, see supra at 8, the use of 

the word "such" in section 658 in all likelihood did not refer

back to "such" a prior civil adjudication.

Whatever the intended meaning of section 658, it seems to us

that the recodification's affirmative separation of section 10908

from other provisions, and deletion of the word "such," reflect a

deliberate decision that liability under the section is to be

distinct from, and not dependent upon, compliance with Chapter

109's civil provisions. See Cardoza-Fonesca, 480 U.S. at 442-43 

("Few principles of statutory construction are more compelling

than the proposition that Congress does not intend sub silentio 

to enact statutory language that it has earlier discarded in

favor of other language.") (citation omitted).

The suggestion that Congress was strengthening the sanction

imposed is reinforced by yet another change. Section 658

included defenses to criminal liability based on reasonableness,

specifying that guilt and punishment would not attach if the

individual charged with sending off an unseaworthy vessel

proves that either he used all reasonable means to
insure her being sent to sea in a seaworthy state, or

-11-

that her going to sea in an unseaworthy state was,
under the circumstances, reasonable and justifiable . .
. .

Elimination of these defenses strikes us as far from

insignificant, contributing to our sense that Congress intended

to clarify and to tighten the obligation of those in control of

vessels to prevent life-threatening accidents. 

We thus find no unequivocal statement of legislative intent

that would permit us to insert a limitation where none exists in

the language of section 10908.9
 

9 We briefly note two other arguments made in support of
Rivera's position. First, Rivera asserts that the competing
interpretations of section 10908 warrant resort to the rule of
lenity, which "commands that genuine ambiguities affecting a
criminal statute's scope be resolved in the defendant's favor,"
United States v. Bowen, Nos. 96-2289, 90, slip op. at 15 (1st 
Cir. Sept. 5, 1997). The rule is triggered only when, "`at the
end of a thorough inquiry, the meaning of a criminal statute
remains obscure,'" Id. (quoting United States v. O'Neil, 11 F.3d 
292, 301 n.10 (1st Cir. 1993)). As we have discussed, this is
not such a case. The plain language of section 10908 is not
ambiguous, and the rule of lenity is therefore inapplicable.
Second, the Maritime Law Association of the United States
contends in its amicus brief that the government's interpretation
of section 10908 must be wrong because it will adversely affect
the long-standing right of vessel owners to utilize the
Limitation of Vessel Owner's Liability Act, 46 U.S.C. 181-189. 
Under the Act, damages claims against a vessel owner following an
accident may be limited to the value of the vessel and freight on
board if the mishap occurred without the privity or knowledge of
the owner. See generally Hercules Carriers, Inc. v. Claimant 
State of Florida, 768 F.2d 1558, 1563-64 (11th Cir. 1985). 
The MLA suggests that the prospect of criminal liability
under section 10908 will chill the use of the Limitation Act out
of fear that an adverse finding under that provision would be
used as prima facie evidence of the crime. The two statutes, 
however, feature different standards of proof and different
burdens of persuasion; the greater protections accorded criminal
defendants guarantee that a decision against a vessel owner in a
limitation proceeding will not establish a "prima facie" criminal
case under section 10908. Moreover, at least one other criminal
provision involving negligent conduct by ship officers and owners
apparently has existed side-by-side with the Limitation Act for

-12-

(3) An absurd result? It is a common occurrence in the law 

that black-and-white principles have an associated set of grey

areas. Such is the case with the plain language rule. Though a

solid anchor of statutory construction, it is not without

exceptions, even in the absence of explicitly contrary

legislative history. We have recognized that a "provision's

plain meaning must govern its application, unless a palpably 

unreasonable outcome would result," Massachusetts v. Blackstone 

Valley Elec. Co., 67 F.3d 981, 986 (1st Cir. 1995) (emphasis 

added); see also Sullivan v. CIA, 992 F.2d 1249, 1252 (1st Cir. 

1993) ("Courts will only look behind statutory language in the

rare case where a literal reading must be shunned because it

would produce an absurd outcome, . . . or when the legislature

has otherwise blown an uncertain trumpet.") (citations omitted).

Rivera contends that this is such a rare case. He asserts

that the imposition of criminal sanctions without the necessary

prerequisites "will convert untold numbers of unsuspecting

persons into prospective criminals," and offers the fact that the

provision has never before been enforced to demonstrate the

injustice of upholding a prosecution that was not preceded by an

administrative finding of unseaworthiness.

Our view, to the contrary, is that the provision is

sufficiently limited in scope to eliminate the specter of

thousands of prosecutions based on wide-ranging claims of

unseaworthiness, and that irrational results will come not from
 

some time. See 18 U.S.C.A. 1115 (listing numerous cases). 

-13-

application of section 10908 in isolation but instead would come

from requiring that the complaint procedure be completed before

the filing of criminal charges. To focus on the many relatively

minor forms of unseaworthiness, as Rivera does in projecting a

flood of prosecutions, is to seize on only a part of the

definition of the crime. The criminal provision requires

knowledge not only that the vessel is unseaworthy but also that

it is afflicted with a defect that is "likely to endanger" life.

Our discussion in Section III, infra, demonstrates that run-of- 

the-mill unseaworthiness cases will not fall within this embrace.

On the other hand, if growing numbers of individuals are

prosecuted and convicted under the required standard, we see

nothing inconsistent with the apparent safety objective of

Congress.

As for the logic of a civil prerequisite, it seems that an

uneven enforcement of law would result. If the crew and officers

of a vessel were intimidated or unknowing, they might not bring

to light egregious circumstances of unseaworthiness that others

might have discovered and reported. We think it irrational to

posit that a prosecution for the dangerous conduct proscribed by

section 10908 could be barred simply because a ship owner or

other potential defendant was able to prevent a civil proceeding

through deception or strong-arm tactics. The Third Circuit,

faced with a similar question under the Clean Water Act, aptly

observed that "we see no reason why the Government should be

hampered by prerequisites to seeking criminal sanctions under the

-14-

Act. . . . Although continued discharges after notification could

be one way for the government to prove scienter, it is certainly

not the only way to establish willful violations," United States 

v. Frezzo Bros., Inc., 602 F.2d 1123, 1126 (3d Cir. 1979).10 

Nor does the novelty of this prosecution suggest to us that

it is unfair or absurd. The prior lack of reported prosecutions

under section 10908 or its predecessor may be a function of the

fact that its coverage is narrow and that other provisions also

reach aspects of the conduct that is actionable under it.

Section 1115 of Title 18, for example, makes it a crime for any

person employed on a vessel, or the owner or charterer of the

vessel, to destroy "the life of any person" through misconduct,

negligence, or inattention to duties. A person who operates a

vessel in a grossly negligent manner "that endangers the life,

limb, or property of a person" commits a misdemeanor under 46

U.S.C. 2302(b). Prosecutors often have a range of statutory

choices in bringing charges, and the historical neglect of

section 10908 and its predecessor, section 658, may reflect only

that it was less obvious than other overlapping statutes because

 

10 The defendants in Frezzo Bros. argued that the 
Environmental Protection Agency could seek criminal remedies only
after first giving notice of the alleged violations of the act or
instituting a civil action. 602 F.2d at 1124. They also
contended that a "willful" violation of the Clean Water Act could
be established only where a party given notice of its violations
continued polluting. The Third Circuit rejected these
contentions and held that the prosecutorial discretion of the
government was not bound by civil proceedings where "nothing in
the text . . . compels the conclusion that prior written notice,
other administrative or civil remedies are prerequisite to
criminal proceedings under the Act." Id. at 1126.  

-15-

of its placement at the end of a provision primarily concerned

with administrative procedures. See United States v. Nippon 

Paper Indus. Co., 109 F.3d 1, 6 (1st Cir. 1997), petition for 

cert. filed, 65 U.S.L.W. 3839 (U.S. June 13, 1997) (No. 96-1987) 

(novel use of a statute is not alone a basis for reversing a

conviction). 

In sum, we cannot say that punishing a responsible person

for knowingly sending a vessel to sea in such a condition as to

endanger life is so "palpably unreasonable," Blackstone Valley 

Elec. Co., 67 F.3d at 986, "difficult to fathom," United States 

v. Indelicato, 97 F.3d 627, 629 (1st Cir. 1996) (citation 

omitted), or "absurd," Sullivan, 992 F.2d at 1252, as to trump 

the unvarnished language of section 10908.11

C. Matters for Congressional Attention. 

Although we are confident that our conclusion is ordained by

the applicable principles of statutory construction, we recognize

that it has some puzzling ramifications. Section 10908 does not

apply to fishing vessels or yachts, apparently exempts harbor

craft and other vessels that operate only on inland waters

(because they are not being sent "to sea"), and does not reach
 

11 We find some support for our judgment that criminal
liability in this context is rational in the court's reference to
section 10908 in Seymore v. Lake Tahoe Cruises, Inc., 888 F. 
Supp. 1029, 1035 (E.D. Cal. 1995). The court there recognized a
wrongful termination cause of action in favor of a captain
terminated for refusing to pilot a vessel he believed was
unseaworthy, posing an unreasonable risk to passengers and crew. 
In endorsing the pilot's claim, the court pointed to section
10908 as evidence of the strong public policy at issue. That
court, at least, did not view criminal responsibility for such
life-threatening conduct to be "absurd."

-16-

foreign vessels operating in United States waters. The scheme

thus operates erratically in protecting seamen from dangerous

conditions.

Similar maritime safety statutes cover more territory, but

do not fill in all of the gaps. Section 1115 of Title 18

punishes negligence and misconduct by any "person employed on any

steamboat or vessel" that results in loss of life, and similarly

imposes criminal responsibility on owners, charterers and

inspectors if their fraud, misconduct or neglect leads to a

death. Section 2302 of Title 46 specifies penalties for

endangering life or property through negligent operation of any

vessel in U.S. waters and of U.S.-owned vessels on the high seas.

It would be of value, we think, for Congress to examine this

area of law for the purpose of evaluating whether to make safety

standards more consistent across categories of vessels and in all

locations subject to United States jurisdiction. 

III. Sufficiency of the Evidence 

The second question certified for en banc review is whether 

the government produced sufficient evidence to support the

verdict that Rivera "knowingly" sent the Emily S. to sea in an 

"unseaworthy" condition "likely to endanger the life of an

individual."12 When assessing a challenge to the sufficiency of
 

12 The term "unseaworthy" is not defined within the statute,
and the question was raised at oral argument whether it should be
given a more limited meaning within this criminal context than in
the maritime setting, where it is "essentially a species of
liability without fault," Seas Shipping Co. v. Sieracki, 328 U.S. 

-17-

the evidence, "`we review the record to determine whether the

evidence and reasonable inferences therefrom, taken as a whole

and in the light most favorable to the prosecution, would allow a

rational jury to determine beyond a reasonable doubt that the

defendant[] [was] guilty as charged.'" United States v. 

Sullivan, 85 F.3d 743, 747 (1st Cir. 1996) (quoting United States 

v. Mena-Robles, 4 F.3d 1026, 1031 (1st Cir. 1993)). 

The original panel opinion noted that a "painstaking review

of the record" had taken place, and we again have read the trial

transcript in its entirety. Although we remain convinced that

the jury had ample evidence upon which to base its finding that

Rivera knowingly sent an unseaworthy vessel to sea, we do not

have the same conviction with respect to the final element of

section 10908, knowledge that the unseaworthiness was such that

it would likely endanger life. We therefore begin our analysis

by repeating essentially verbatim the panel's discussion of

unseaworthiness, and then proceed to explain why the evidence of

likely to endanger was insufficient to support the conviction.

A. Knowingly sending a vessel to sea in an unseaworthy 

condition 

 

85, 94 (1946). Because we believe the mens rea requirement 
("knowingly") and the "likely to endanger the life of an
individual" element serve to sharply limit prosecutions under the
provision, we see no reason to depart from the common usage of
the term. We therefore understand an "unseaworthy" vessel to be
one not properly outfitted or safe for a voyage at sea. See The 
Random House Dictionary of the English Language 1728 (2d ed. 
unabridged 1987).

-18-

We note at the outset that Rivera had many years of

experience in the tug and barge industry, having served with a

major tug and barge company in Puerto Rico prior to his

employment with the Bunker Group. In addition, the record is

replete with instances indicating that Rivera was informed before

the fateful voyage of the precarious condition of the tow wire:

-- Roy McMichael, the captain of the tugboat, testified

that before the vessel set out, he raised with Rivera the

condition of the wire, the need for its replacement, and the

difficulty of getting the repair performed due to the holiday.

-- Victor Martinez, who served as a mate on the voyage,

testified that he had discussed with Rivera that "the conditions

[sic] of the wire were not too favorable."

-- Yaacov Eisak, who served as the tugboat engineer on the

Emily S., testified that in December 1993 or early January 1994, 

he had "about two" conversations with Pedro Rivera, in which he

joked with him that "we should get some bait and we can catch

some fish with so many hooks what [sic] we were having on the

wire."13

-- Leonard Furmanski, who had previously served as an

engineer on the Emily S. when she experienced a prior separation 

of the wire as the boat left Guayanilla in August 1993, testified

that on his return to San Juan, he told Rivera that it was time

to replace the wire.

 

13 When tow wires deteriorate, short sections of wire split
off and protrude in what are colloquially known as "fish hooks."

-19-

-- Danny Kehoe, who alternated with McMichael as the

captain of the tugboat, and who was at the helm during the

Guayanilla parting, testified that he told Rivera "at least six,

seven times" that the towing wire needed to be replaced, and he

made an entry in the boat's logbook on December 8, 1993 that the

cable required replacing and that he had so informed Rivera.

Kehoe testified that he had made this entry because he thought

Rivera was not taking him seriously.

The jury also heard expert evidence on the subject of the

wire's condition. The government presented the testimony of

Glenn Hargrave, a tugboat captain, who testified that it was his

opinion, based on his review of the Coast Guard report, the FBI

report and its accompanying photographs, and on his examination

of the wire itself,14 that the wire was not fit for towing

operations as of the date of the accident. FBI Special Agent

Tobin characterized the "embrittled" and "deteriorated" wire as

"a disaster waiting to happen."

Faced with this evidence of the wire's condition and the

multiple warnings about the need to replace it, as well as

evidence of Rivera's extensive experience in this field, we

cannot say that there was insufficient evidence presented to

support the jury's conclusion that Rivera knowingly sent a vessel

to sea in an unseaworthy condition. We recognize that there was

 

14 Specifically, Hargrave pointed to the large number of
"fish hooks" on the wire, the severe corrosion of the wire, and
the lack of flexibility of the wire, as indicating its lack of
fitness for towing service on January 6, 1994.

-20-

competing evidence. Rivera's expert, for example, a specialist

in metallurgy, testified that the cable was strong enough to tow

the load on the day of the accident. Some evidence also showed

that Rivera consulted with Captain McMichael and another

experienced captain, George Emanuel, about whether to make and

continue the voyage without first replacing the tow wire.

The jury, however, was entitled to discount Rivera's expert

in light of the other testimony, and could have found on this

record that Rivera decided to go ahead with the voyage not

because he believed the vessel was seaworthy but because he

thought he could get by with one more trip using the seriously

deteriorated wire. Section 10908 seems designed for precisely

this sort of situation, imposing liability when an individual

deliberately fails to take remedial measures for pragmatic

reasons, at the expense of safety. We therefore hold that the

evidence was sufficient for the jury to find that Rivera knew

that the Emily S. was unseaworthy. 

B. "Likely to Endanger" 

We now revisit the question of whether there was sufficient

evidence for a jury to find that Rivera knew the tug's condition

was "likely to endanger the life of an individual."

In so doing, we face two conflicting constraints. The first

is that, as in all criminal appeals by defendants, we must give a

great deal of deference to the evidence adduced in favor of the

government. The second is that we must be vigilant in preventing

any slackening of a standard that Congress saw fit to require as

-21-

the necessary predicate of the ultimate sanction of criminal

liability.

In a prosecution of this nature, there is an inherent hazard

in the necessity of two juxtaposed jury findings, one involving

knowledge of unseaworthiness, and the other knowledge of

likelihood of such unseaworthiness endangering life. Unless

courts remain acutely aware that the prosecutor bears separate

burdens on these two issues, there is a lively danger that, once

a jury has found not only that an unseaworthy condition existed,

but also that a defendant knew of that condition, it could

quickly be impressed by the possibility of any number of life

threatening events. A slippery deck, a malfunctioning winch, or

poor stowage all can lend themselves to fatal scenarios. There

is very little that can go wrong at sea without some risk to

human life.

But the test is not "possibility" or "some risk." It is of

a significantly higher order, "likely to endanger life." Not

only do logic and the need to avoid watering down the

prerequisite to criminal liability support this statement, but

also the common understanding of the word "likely." At times,

dictionary definitions give mixed signals, or are opaque or

otherwise less than compelling indicia of legal meaning. But the

definitions of the adverb "likely" are consistent, clear and

strong: in one dictionary the meaning is simply "probably," see 

The Random House Dictionary of the English Language 1114 (2d ed. 

unabridged 1987); in another, the meanings are "in all

-22-

probability" and "probably," see Webster's Collegiate Dictionary 

674 (10th ed. 1993).

In the context of this statute imposing criminal liability,

we think that there must be sufficient evidence of a (known)

defect that poses a very substantial threat to life. This is not

a mathematical formula. It is not a "more probable than not"

test. The prosecution should not have to prove that the chances

of surviving such a defect are less than fifty percent. But the

threat should be one that, objectively viewed, poses an

unacceptable risk to an individual. It seems to us that

instances of loss of life beyond the rare or bizarre, or a

condition so inherently life threatening that it needs no record

of experience, must be shown.

In this case, the evidence falls significantly below

anything approaching these showings. The government's evidence

of the danger posed by a broken tow wire was entirely

speculative. The most dramatic testimony -- Captain Hargrave's

assertion that an individual on deck could be cut in half by a

wire snapping back like a rubber band after it breaks -- was

unsupported by any evidence that such an accident ever had

occurred. Captain Robert Ross of the Coast Guard described a

series of dangers attributable to a barge breaking loose from a

tugboat, but his testimony failed to establish that these were

other than a worst case scenario. There was no evidence that

such dire consequences could be expected more than infrequently

when a wire parted. 

-23-

In fact, witness after witness testified to experiences with

cable partings, but none reported any resulting human injury. 

Captain McMichael's testimony that the wire hit him after he

repaired it, "knock[ing] the wind out of me a little bit,"

obviously falls short of meeting a "likely to endanger life"

standard. Similarly, Captain Ross's description of the dangers

associated with the effort to contain this particular oil spill

do not demonstrate that a deteriorated tow wire is a danger to

human life. Indeed, the evidence indicated that the damage that

did occur was the result of aberrant circumstances. The

testimony was that a proper repair the first time probably would

have prevented the second parting, and that the barge remained

adrift and eventually went aground after the second break because

crew members were not following prescribed procedures for

operating the tugboat. Rivera can not be charged with

anticipating such events.

The government's evidence, in sum, showed only that the

parting of a tow wire could pose a serious risk to human life. 

This is inadequate to prove that Rivera violated section 10908 by

sending a vessel to sea knowing that its unseaworthy condition

was likely to endanger life. 

IV. Conclusion 

Having concluded that the plain language of section 10908

permitted this prosecution of appellant Rivera without a prior

finding of unseaworthiness, but that the evidence presented at

-24-

trial failed to prove an essential element of the charged crime,

we reverse the conviction. 

Concurrence follows.

-25-

TORRUELLA, Chief Judge (Concurring). Even though the TORRUELLA, Chief Judge (Concurring). 

majority's limited interpretation of 46 U.S.C.A. 10908 (Supp.

1997 - Title 46 Partial Revision) goes far in reducing the

potential for disrupting the maritime industry that was portended

by the government's and district court's interpretation of that

statute, I cannot join the majority without reservation. I write

separately because, with respect, I believe my colleagues are in

error in declaring that prosecutions under section 10908 may be

instituted without a prior finding of unseaworthiness pursuant to

the procedures set forth in Chapter 109, 46 U.S.C.A. 10901-08.

This interpretation improperly excises section 10908 from the

statutory scheme of which it is a part and runs contrary to the

legislative intent that guided the recodification of these safety

regulations. Most importantly, the majority's views are

counterproductive to the remedial ends pursued by Chapter 109.

Section 10908 is the ultimate sanction for a violation of

the procedures set forth in Chapter 109. When a vessel appears

to be unfit to be sent to sea, its chief and second mates, or the

majority of its crew, may file a complaint with the vessel's

master before the vessel leaves the harbor. 10902. The master

then applies to a district court for appointment of independent

surveyors, id., whereupon they file a report with the court. 

10903(a). The court then rules whether the vessel is fit to

proceed on the voyage. 10903(h). If deficiencies are found

and corrected, the crew must proceed on the voyage or forfeit

their unpaid wages. 10904. If deficiencies are found but not

-26-

corrected, and the ship is in a foreign port, a seaman may

request to be discharged and is entitled to one month's pay in

addition to wages owed. 10906. Furthermore, if deficiencies

of such gravity "that [they are] likely to endanger the life of

an individual" are found and not corrected, and the vessel is

nevertheless sent to sea, criminal sanctions may be imposed. 

10908.

The majority, however, contends that section 10908 is a

criminal sanction of general applicability that is unconnected to

the Chapter 109 procedures. My colleagues begin and end their

analysis of section 10908 by relying on the maxim of statutory

interpretation that when the "plain meaning" of a statute "is

clear on its face, the sole function of the courts is to enforce

it according to its terms." Ante at 4. They argue that we are 

bound by this "plain meaning" or "plain language" canon to

interpret section 10908 without reference to Chapter 109's

procedures.

As the majority acknowledges, ante at 7, precedent from both 

the United States Supreme Court and this Circuit establishes that

the "plain language" rule requires the examination of a statute's 

textual context. See Conroy v. Aniskoff, 507 U.S. 511, 515 

(1993) (the "cardinal rule [is] that a statute is to be read as a

whole . . . , since the meaning of statutory language, plain or

not, depends on context"); Skidgel v. Maine Dept. of Human 

Services, 994 F.2d 930 (1st Cir. 1993). Nevertheless, my 

brethren "find no aid to construction in the provisions

-27-

surrounding section 10908" because in this case "the relevant

'context' is subject to different interpretations." Ante at 7. 

Thus, "[t]aking section 10908 at face value, without limitations,

avoids any uncertainty." Ante at 8.  

I disagree with my colleagues' appraisal of the usefulness

of context in this case. Although the language of section 10908

is plain, its meaning can only be determined by reference to the

text of the surrounding provisions. The majority implicitly

concedes the point when it notes that "Section 10908 does not

apply to fishing vessels or yachts." Ante at 16. It arrives at 

this conclusion, not from any language found in section 10908,

but rather from the text of the first section of Chapter 109,

which reads: "This chapter applies to a vessel of the United 

States except a fishing or whaling vessel or yacht." 46 U.S.C.A.

10901 (Emphasis supplied.) It is not an insignificant

coincidence that sections 10901 and 10908 were both extracted

from former section 658. Thus, the need to refer to section

10901 to interpret the "plain language" of section 10908 suggests

that Chapter 109 is to be read and applied cohesively.

The placement of section 10908 within Chapter 109 is in

itself a telling sign. Chapter 109, entitled "Proceedings on

Unseaworthiness," is located within Part G, "Merchant Seamen

Protection and Relief," of Subtitle II of Title 46. The

provisions of Part G form an interlocking whole and are

exclusively concerned with regulating the relationship between

seamen and the masters and owners of the vessels in which they

-28-

set out to sea. Thus, the placement of a generally-applicable

criminal statute anywhere within Part G, let alone within Chapter

109, would have made little sense.15

Similarly, Part G codifies many of the requirements covered

by the traditional warranty of seaworthiness.16 Indeed, a vessel
 

15 In contrast, the other two statutes under which the
government could have proceeded in this case are located in much
more appropriate contexts. Thus, 46 U.S.C.A. 2302(b), which
makes it a misdemeanor to operate a vessel in a grossly negligent
manner, appears in Title 46, Subpart II, Part A - General
Provisions, Chapter 23 - Operation of Vessels Generally. 
Similarly, 18 U.S.C.A. 1115 (Supp. 1997), which makes it a
felony when the negligence of a ship's officer results in the
loss of human life, appears in the United States Criminal Code.

Sections 2302(b) and 1115 are also much broader in scope than
section 10908. The former are both applicable to all vessels in
U.S. waters, whether inland or coastal, and whether sailing under
U.S. or foreign flags. Section 10908, on the other hand,
excludes foreign vessels, fishing vessels, and yachts, as well as
other vessels operating in harbors and inland waters, which makes
sense only for a statute concerned exclusively with seamen.

The majority admits to being puzzled by the limited scope of
section 10908, and recommends that Congress consider making
"safety standards more consistent across categories of vessels
and in all locations." Ante at 16. The apparent inconsistency 
disappears under my reading of the statute. Thus, the exclusion
of foreign vessels follows from the fact that Part G's provisions
apply only to vessels sailing under the United States flag. It
is also understandable that fishing vessels, harbor vessels,
private yachts, and vessels on inland waterways are excluded from
section 10908. Such vessels are excluded from most of the
provisions of Part G because they usually set out to sea only for
short voyages, rendering unnecessary the detailed statutory
scheme established by Part G for seamen going out to sea on
intercoastal or ocean voyages.

16 The warranty of seaworthiness provides that the owner of
a vessel owes an absolute duty to seamen to provide a ship's
hull, gear, appliances, ways, and appurtenances which are
reasonably fit for their intended purpose, Mitchell v. Trawler 
Racer, Inc., 362 U.S. 539 (1960), as well as to appoint a 
competent master and a crew adequate in their number and
competent for their duty, Usner v. Luckenbach Overseas Corp., 400 
U.S. 494 (1971).

-29-

is unseaworthy in precisely the same circumstances in which, for

purposes of section 10902, it is unfit to proceed on its intended

voyage. Consequently, the reference in section 10908 to

unseaworthiness can only be interpreted in the light of the other

provisions of Chapter 109 and Part G.

Reading Chapter 109 as a whole reveals why, as admitted by

the government, there has never been a criminal prosecution

pursuant to either section 10908, or its predecessor statute,

section 658. See Appendix. The goal of Chapter 109 is to 

correct unseaworthy conditions before they pose a serious danger 

at sea. Section 10908 serves as a deterrent, providing seamen

with the leverage to force their vessel's master to comply with

Chapter 109. Sections 658 and 10908 have never been used

because, once the court-appointed marine surveyors have found a

vessel to be unseaworthy, only the most reckless of masters would

insist on setting out to sea without first repairing the vessel.

Moreover, the master may not even be able to set out to sea in

the face of such a finding because the seamen may choose to

remain on land and receive one month's wages as severance pay. 

10906. Unfortunately, my brethren's insular interpretation of

section 10908 replaces the corrective focus of Chapter 109 with a

punitive one, since civil sanctions cannot be imposed unless the

civil complaint procedures are followed, while criminal sanctions

are always available.

An examination of section 10908's predecessor statute, 46

U.S.C.A. 658 (1958), establishes even more clearly that the

-30-

civil procedures of Chapter 109 must be initiated before section

10908 may be invoked. In 1983, Congress recodified much of the

law as to seamen, and in doing so split section 658 into sections

10901, 10906, and 10908. Pub. L. No. 98-89 (1983). Section 658

established the penalties that would attach if court-appointed

inspectors were to find a vessel unseaworthy in some respect.

The inclusion of both civil and criminal penalties within the

same section was a clear indicator that the criminal penalties

were the ultimate sanction for violations discovered pursuant to

the civil complaint procedures.

Section 10908 should be understood in the context of

section 658 because no substantive change was intended to result

from the recodification, as is evident from the history of Public

Law 98-89. See H.R. Rep. No. 98-338 (1983), reprinted in 1983 

U.S.C.C.A.N. 924. House Report No. 98-338 states that:

The ultimate aim of this legislation is three fold: to
make maritime safety and seaman protection law easier
for the Coast Guard to administer, to make it less
cumbersome for the maritime community to use, and to
make it more understandable for everyone involved.

Id. at 113, 1983 U.S.C.C.A.N. at 925. During the hearings held 

by the House, an interesting exchange took place between

Congressman Studds of Massachusetts, and Admiral Lusk of the

Coast Guard, the agency entrusted with enforcing the statute:

Mr. Studds: Some have expressed concern that this 
recodification may prompt a series of long and
expensive court cases initiated for the purpose of
testing the judicial interpretation of terms and
concepts contained in the revised law. Do you see any
risk that this sort of scenario might unfold as a
result of the enactment of this bill?

-31-

Admiral Lusk: I don't think so sir. I understood that 
it was to be made so clear everywhere that we weren't
trying to make any substantive changes of a
controversial nature.

Hearings of H.R. 2247, Subcommittee on Coast Guard and

Navigation, House Committee on Merchant Marine and Fisheries, 98

Cong., 1st Sess. at 455 (Add. p. 1). This is confirmed by the

Report that accompanied this recodification, which stated:

Although the Committee realized that many substantive
changes would inevitably be made in any effort to
simplify and modernize the maritime safety laws, it
intended to make no changes that would prove to be
detrimental to or adversely impact upon the industry
governed by these laws. More specifically it sought to
insure that this bill not take away any existing
rights, benefits or privileges from any person, nor
place any greater duties or obligations on any person.

H.R. Rep. No. 338, 98th Cong., 1st Sess. at 118-119 (1983) (Add.

pp. 11-12). Thus, Congress simply took the then-existing

legislation and rearranged it in a more comprehensible manner.

Id. The "plain meaning" rule does not govern recodification 

statutes such as Pub. L. No. 98-89. As the Report correctly

points out, in the usual kind of amendatory legislation, "a

change of language is intended to change substance. In a

codification statute, however, the courts uphold the contrary

presumption: no change in law is intended unless clearly

expressed." Id. at 118-119 (Add. at 11-12). The Supreme Court 

has held in numerous cases that: 

[T]he change of arrangement, which placed portions of
what was originally a single section into separated
sections cannot be regarded as altering the scope and
purpose of the enactment. For it will not be inferred
that Congress in revising and consolidating the laws
intended to change their effect, unless such intention
is clearly expressed.

-32-

Fourco Glass Co. v. Transmirra Products Corp., 353 U.S. 222, 227 

(1957) (citing United States v. Ryder, 110 U.S. 729, 740 (1884)); 

see Finley v. United States, 490 U.S. 545, 553-55 (1989); Mu iz 

v. Hoffman, 422 U.S. 454, 467-74 (1975); Tidewater Oil Co. v. 

United States, 409 U.S. 151, 162 (1973); Anderson v. Pacific 

Coast S. Co., 225 U.S. 187, 198-199 (1912). Since the House 

Report does not even discuss the purported change in the law

urged by the government, let alone clearly express an intent to

enact such a change, one may safely conclude that no substantive

change in this section was ever intended.

Furthermore, we should be guided by our own precedent that

counsels examination of statutes as a whole, and that due weight

be given "to design, structure and purpose as well as to

aggregate language." O'Connell v. Shalala, 79 F.3d 170, 176 (1st 

Cir. 1996) (citation omitted); United States v. Falvey, 676 F.2d 

871 (1st Cir. 1982). Falvey involved a prosecution for 

possession of counterfeit foreign coins under a statutory scheme

first enacted in 1877 but extensively rephrased in 1965. 18

U.S.C. 185. Until 1965, the statute's scope had been limited,

to foreign coins in actual use and circulation as money within

the United States. However, because the 1965 version of the law

simply made it a felony to counterfeit silver coins, the

government sought to apply the statute to counterfeit foreign

currency that was not either in actual use or circulation in the

United States.

-33-

This court rejected the government's contention, which was

principally based on minor references to section 185 in the

legislative history. Speaking for this court, Judge Campbell

said:

From this slender reed, the government constructs its
argument that in 1965, Congress intended, in a minor
provision of an act with an entirely different purpose,
to make a major change in a statute dating back to
1806. We cannot accept such an argument.

. . . [I]n the complete absence of any evidence that
the wording was aimed at bringing about substantive
changes other than the one expressly reflected in the
legislative history, the most plausible explanation of
the revised phraseology is that it was simply intended
to eliminate the awkwardness of expression that was
introduced in 1877 and carried through the 1948
version. The draftsman, we surmise, merely sought to
"clean up the language" - falling into the trap, as can
easily occur where statutory language is rephrased, of
unintentionally suggesting a substantive change. In
light of the history of this statute and the absence of
any indication of an intention in 1965 to change its
scope, it would be anomalous to read the amended
statute as broader in coverage than its predecessors .
. . Cases construing changes in statutory language tend
to rely in part on evidence of congressional intent or
at least attention to the change in deciding whether to
give the change its literal effect . . . In the absence
of these factors, courts are not bound to read a
statute literally in a manner entirely at odds with its
history and apparent intent.

676 F.2d at 875.

My colleagues view the legislative history in this case as

sending "mixed signals," ante at 9, with some of it suggesting 

that the purpose of the legislation was simply to recodify the

then-existing law, with no changes intended, and other parts

indicating that "[t]he bill . . . [did] in fact make a great many

substantive changes to the present law . . . [which] should be

understood . . . [as] intended by the [Congress]." See H.R. Rep. 

-34-

No. 98-338 at 113, 1983 U.S.C.C.A.N. at 925. They further quote

from that Report to the effect that neither logic nor case law

"mandate . . . reliance on legislative history to reach a result

contrary to the plain meaning of the statute." Id. at 120, 932. 

These references miss the point. They are only applicable

to substantive changes in Chapter 109. Can it be seriously 

argued that merely moving text from section 658 to a separate

section, section 10908, with virtually identical language,

constitutes a substantive change in that statute? With due 

respect, I think not.17 See Finley, supra; Fourco Glass Co., 

supra; Mu iz, supra; Falvey, supra. In fact, those provisions of 

Chapter 109 that are substantive changes from the prior statute

are readily apparent from a comparison of both laws. See 

Appendix. One of these is the section immediately preceding

section 10908, 10907, which prohibits a master from impeding a

seaman from making "a complaint authorized by this chapter," and

provides a civil penalty for such conduct. Section 10907 does

not appear in the old text. 

Thousands of vessels take to sea every day throughout the

United States, and surely many of them do so in an "unseaworthy

state that is likely to endanger the life of an individual." The

fact that there has been no prior invocation of either section
 

17 The case relied upon by the majority, United States v. 
Frezzo Bros., Inc., 602 F.2d 1123 (3d Cir. 1979), is inapposite.  
The Third Circuit was there faced with the task of interpreting
the Clean Water Act. That statute, 33 U.S.C. 1251, et seq., 
which is of relatively recent vintage (1972), contains neither
procedures similar to those in Chapter 109, nor is it the result
of a recodification scheme.

-35-

658 or section 10908 thus casts further doubt on the view that

Congress by this recodification intended to enact a major change

in the maritime law, without making any specific statement to

that effect. Although I would be the last to condone sending an

unseaworthy vessel to sea, and sincerely hope that deliberate

environmental damage does not go unpunished, the imposition of

criminal sanctions under the present circumstances constitutes a

radical departure from what has been the custom and practice in

the maritime world to the present time. 

Notwithstanding that the majority's holding on the

sufficiency of the evidence ameliorates the impact of this new

interpretation of the statute, it nonetheless poses a substantial

threat of converting untold numbers of unsuspecting persons into

prospective felons. Although Congress could very well enact a

statute with the reach envisioned by the majority, I am hard

pressed to accept such a significant break with the past,

particularly where criminal sanctions are at stake, absent a

clear indication that such construction is the intended result of

what appears to be a mere reshuffling of a longstanding maritime

safety statute. See Falvey, supra.  

Finally, the fact that the interpretations of section 10908

proposed by Rivera and the government are "both . . . consistent

with what [the majority] see[s] as the overall purpose of the

legislation," ante at 7, should at the very least suffice to 

trigger the operation of the rule of lenity, which "commands that

genuine ambiguities affecting a criminal statute's scope be

-36-

resolved in the defendant's favor," ante at 11 n.8 (quoting 

United States v. Bowen, Nos. 96-2289, 90, slip. op. at 15 (1st 

Cir. Sept. 5, 1997)). The majority refuses to apply the rule

because "[t]he plain language of section 10908 is not ambiguous." 

Ante at 11 n.8 (emphasis added). However, in applying the rule 

of lenity the inquiry is not whether the language of the statute

is plain, but rather whether its meaning is clear. See United 

States v. O'Neill, 11 F.3d 292, 301 n.10 (1st Cir. 1993) (the 

rule is applicable when "at the end of a thorough inquiry, the

meaning of a criminal statute remains obscure") (emphasis added). 

The meaning and scope of section 10908 can hardly be described as

unambiguous when, as the majority admits and this concurrence has

shown, it remains subject to two reasonable but competing

interpretations. Thus, if Congress accepts the majority's

invitation to look into this matter, ante at 16, I also suggest 

that it define unambiguously the nature of the relationship

between Chapter 109's civil and criminal provisions.

-37-

Appendix: A Comparison of Provisions Appendix

Predecessor Statute: Current Chapter 109: Predecessor Statute: Current Chapter 109:
46 U.S.C. 653-658 "Proceedings on 46 U.S.C. 653-658 "Proceedings on
Unseaworthiness," Unseaworthiness,"
46 U.S.C. 10901-10908 46 U.S.C. 10901-10908

653: Complaint that 10901: Application. 
V e s s e l i s 
Unseaworthy. "This chapter applies to a 
vessel of the United
"If the first and second States except a fishing or
officers under the master whaling vessel or yacht." 
or a majority of the crew
of any vessel bound on any 10902: Complaints of 
voyage shall, before the unfitness. 
vessel shall have left the
harbor, discover that the "(a)(1) If the chief and (a)(1)
vessel is too leaky or is second mates or a majority
otherwise unfit . . . to of the crew of a vessel
proceed on the intended ready to begin voyage
voyage, and shall require discover, before the
such unfitness to be vessel leaves harbor, that
inquired into, the master the vessel is unfit . . .
shall, upon the request of to proceed on the intended
the first and second voyage and require the
officers under the master unfitness to be inquired
or such majority of the into, the master
crew, forthwith apply to immediately shall apply to
the judge of the district the district court of the
court of that judicial United States at the place
district . . . for the at which the vessel is
appointment of surveyors, located . . . for the
as provided in section 654 appointment of surveyors.
of this title, taking with At least 2 complaining
him two or more of the seamen shall accompany the
crew who shall have made master to the judge or
such request . . . . [A]ny justice of the peace.
master refusing to comply (2) A master failing to (2)
with these provisions comply with this
shall be liable to a subsection is liable to
penalty of $500. This the United States
section shall not apply to Government for a civil
fishing or whaling vessels penalty of $500."
or yachts."

-38-

654: Proceedings on 10903: Proceedings on 
examination of examination of 
vessel. vessel. 

"The judge, or justice, in "(a)On application under "(a)
a domestic port, shall, section 10902(a) of this
upon such application, title, the judge or
issue his precept, justice of the peace shall
directed to three persons appoint 3 experienced and
in the neighborhood, the skilled marine surveyors
most experienced and to examine the vessel for
skillful in maritime the defects or
affairs that can be insufficiencies complained
procured . . . . It shall of . . . . The surveyors
be the duty of such shall make a report in
surveyors to repair on writing . . . stating
board such vessel and to whether the vessel is fit
examine the same in to proceed to sea, and, if
respect to the defects and not, in what respect it is
insufficiencies complained unfit, making appropriate
of, and make reports to recommendations . . . .
the judge . . . in writing (b) On receiving the (b)
. . . whether in any or in report, the judge or
what respect the vessel is justice shall endorse on
unfit to proceed on the the report the judgment of
intended voyage . . . . the judge or justice on
[U]pon such report the whether the vessel is fit
judge or justice shall to proceed on the voyage .
adjudge and shall indorse . . .
on his report his judgment (c) The master shall pay (c) 
whether the vessel is fit all costs of the survey .
to proceed on the intended . . .
voyage, and, if not, (d) A master of a vessel (d)
whether such repairs can violating this section is
be made or deficiencies liable to the United
supplied . . . . The States Government for a
master or commander shall, civil penalty of $100 . .
in the first instance, pay . ."
all costs of such a review
. . . ."

-39-

655: Refusal to proceed 10904: Refusal to 
when vessel found proceed. 
seaworthy. 
"After a judgment under
"If, after judgment that section 10903 of this
such vessel is fit to title that a vessel is fit
proceed . . . [or after to proceed . . . or after
performing the directed the order of a judgment to
alterations] the seamen, make up deficiencies is
or either of them, shall complied with, if a seaman
refuse to proceed on the does not proceed on the
voyage, he shall forfeit voyage, the unpaid wages
any wages that may be due of the seaman are
him." forfeited."

-40-

656: Appointment of 10905: Complaints in 
inspectors by consul foreign ports. 
in foreign port. 
"(a) When a complaint (a)
"Upon a complaint in under section 10902(a) of
writing, signed by the this title is made in a
first and second officers foreign port, the
or a majority of the crew procedures of this chapter
of any vessel, while in a shall be followed, with a
foreign port, that such consular officer
vessel is in an unsuitable performing the duties of
condition to go to sea . . the judge or justice of
. the consul shall cause the peace.
to be appointed three (b) On review of the (b)
persons of like marine surveyors' report,
qualifications with those the consular officer may
described in section 654 approve and must certify
of this title, who shall any part of the report
proceed to examine into with which the officer
the cause of the complaint agrees. If the consular
and who shall proceed to officer dissents from any
be governed in all their part of the report, the
proceedings as provided by officer shall certify
said section." reasons for dissenting
from that part."
657: R e p o r t o f 
inspectors. 

"The inspectors appointed
by any consul, in
pursuance of section 656
of this title, shall have
full power to examine the
vessel . . . .[I]f, upon a
view of the whole
proceedings, the consul is
satisfied therewith, he
may approve the whole or
any part of the report,
and shall certify such
approval; or if he
dissents, he shall certify
his reasons for
dissenting." 

-41-

658: Discharge of crew on 10906: Discharge of crew 
a c c o u n t o f for unsuitability. 
unseaworthiness; 
penalty for sending "When a survey is made at 
unseaworthy vessel a foreign port, the 
to sea. surveyors shall state in 
the report whether, in
"The inspectors [shall their opinion, the vessel
state whether] the vessel had been sent to sea
was sent to sea unsuitably unsuitably provided in any
provided in any important important particular, by
or essential particular, neglect or design or
by neglect or design, or through mistake or
through mistake or accident. If by neglect
accident; and in case it or design, and the
was by mistake or design, consular official approves
and the consular officer the finding, the officer
approves of such finding, shall discharge a seaman
he shall discharge such of requesting discharge and
the crew as request it, shall require the master
and shall require the to pay one month's wages
payment by the master of to that seaman in addition
one month's wages of each to wages then due, or
seaman over and above the sufficient money for the
wages then due . . . . But return of the seaman to
if in the opinion of the the nearest and most
inspectors the defects or convenient port of the
deficiencies found to United States, whichever
exist have been the result is the greater amount."
of mistake or accident,
and could not, in the 10907: Permission to make 
exercise of ordinary care, complaint. 
have been known and
provided against before "(a) A master may not (a)
the sailing of the vessel, refuse to permit, deny the
and the master shall in a opportunity to, or hinder
reasonable time to remove a seaman who wishes to
or remedy the causes of make a complaint
complaint, then the crew authorized by this
shall remain and discharge chapter.
their duty. If any person (b) A master violating (b) 
knowingly sends or this section is liable to 
attempts to send or is the United States for 
party to the sending or civil penalty of $500." 
attempting to send an 
American ship to sea, in 10908: Penalty for 
the foreign or coastwide s e n d i n g 
trade, in such an unseaworthy vessel 
unseaworthy state that the to sea. 
life of any person is 
likely to be thereby "A person that knowingly 

-42-